*Decision will be entered for the respondent.*

WILLIAM R. FUCHS AND ALICE S. FUCHS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOSEPH GENSTEIN AND DOROTHY GENSTEIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18961–81, 18962–81.    Filed July 19, 1984.

*Marvin S. Lieber, Charles B. Gibbons,* and *Harry F. Klodowski, Jr.,* for the petitioners.

*Francis J. Emmons* and *Robert B. Marino,* for the respondent.

FEATHERSTON, *Judge:* These consolidated cases were assigned to and heard by Special Trial Judge John J. Pajak, pursuant to the provisions of section 7456(c) of the Code and Rules 180 and 181.[1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

PAJAK, *Special Trial Judge:* In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes for the respective years:

| Docket No. | Petitioners | Years | Deficiency |
|---|---|---|---|
| 18961–81 | William R. Fuchs | 1977 | $2,789 |
| | and Alice S. Fuchs | 1978 | 2,453 |
| 18962–81 | Joseph Genstein | 1976 | 7,119 |
| | and Dorothy Genstein | 1977 | 2,994 |
| | | 1978 | 2,643 |

In each case, respondent disallowed the distributable share of losses from a limited partnership, the Chinese Ultimatum Co., claimed on petitioners' returns.

The issues for decision are: (1) Whether the partnership was engaged in for profit; (2) whether the partnership may deduct interest on certain nonrecourse indebtedness; (3) whether the partnership was a sham organized to create artificial tax deductions; (4) whether the nonrecourse indebtedness should be included in the bases of the partnership and the partners; (5) whether the partnership properly depreciated rights in an

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the taxable years in question, unless otherwise indicated. All references to a Rule are to the Tax Court Rules of Practice and Procedure.

original paperback book, "The Chinese Ultimatum"; (6) whether the partnership was entitled to deduct various miscellaneous items under either section 162 or section 212; and (7) whether the agreement between the partnership and Pinnacle Books, Inc., constituted a sale of the partnership's interest in the manuscript or a "lease of section 1245 property" within the meaning of section 465(c)(1)(C).

This case is one of two groups of cases which were heard pursuant to test case procedures for purposes of judicial economy of benefit to petitioners, respondent, and the Court. For the same reason, since most of the witnesses had testimony relevant to each of the groups, the test case of *Dean*, docket No. 22565–80, decided this day in *Dean v. Commissioner*, 83 T.C. 56 (1984), was consolidated for trial at the same special session of the Court, as were these cases. The *Dean* case pertains to a limited partnership involving "The Season" original paperback book and rights thereto. This case pertains to a limited partnership involving "The Chinese Ultimatum" original paperback book and rights thereto.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners William R. Fuchs and Alice S. Fuchs resided in Lock Haven, PA, when their petition was filed. Petitioners Joseph Genstein and Dorothy Genstein resided in Pittsburgh,

---

[2]As noted above, by agreement of the parties, this case is a test case for certain other cases with respect to all issues relating to the adjustment regarding "The Chinese Ultimatum Limited Partnership." The parties have stipulated that they will be bound by the final decision in this case on those issues. The petitioners and docket numbers of those cases are: David E. Small and Eileen Small, docket No. 318–82; Irving S. Stapsy, docket No. 18963–81; Joseph E. Rusnock and Margaret Rusnock, docket No. 18959–81; Paul R. Bridges and Ann T. Bridges, docket No. 14292–81; Quentin E. Wood and Louise L. Wood, docket No. 14294–81; and James C. Blackman and Linda C. Blackman, docket No. 13666–82.

By stipulation, the cases listed in this paragraph are some of the cases bound on the statute of limitations issue by the final decisions in the test cases of Bridges, docket No. 14292–81, and Wood, docket No. 14294–81, in which we issued an opinion entitled *Bridges v. Commissioner*, T.C. Memo. 1983–763: Irving S. Stapsy, docket No. 18963–81; Joseph E. Rusnock and Margaret Rusnock, docket No. 18959–81; and Joseph Genstein and Dorothy Genstein, docket No. 18962–81.

Since other issues remain in two of the cases which are not automatically resolved by resolution of the statute-of-limitations issue in *Bridges v. Commissioner, supra*, and/or of "The Chinese Ultimatum Limited Partnership" issues in this case, the following cases will be restored to the general docket for resolution of those other issues: James C. Blackman and Linda C. Blackman, docket No. 13666–82; and Quentin E. Wood and Louise L. Wood, docket No. 14294–81.

PA, when their petition was filed. For ease of reference, we will refer to petitioners William R. Fuchs and Alice S. Fuchs as "petitioner" or "petitioner Fuchs," to petitioners Joseph Genstein and Dorothy Genstein as "petitioner" or "petitioner Genstein," and to both sets of petitioners as "petitioners." On their pertinent Federal income tax returns, petitioners deducted losses in connection with the Chinese Ultimatum Co. (Chinese Ultimatum Co.), a limited partnership formed under the laws of Delaware. Respondent disallowed these loss deductions.

### *"The Chinese Ultimatum"; an Original Paperback Book*

The original paperback book, "The Chinese Ultimatum," concerns the outbreak of war amongst the world's superpowers. It tells the story of the explosion of world political forces during a 1-week period, as seen through the eyes of the two principal characters, a high-ranking U.S. diplomat and his news-broadcaster girl friend.

Edward M. Harper (Harper), using the pen name "Edward McGhee," was the author of "The Chinese Ultimatum." The cover of this original paperback lists as authors, "Edward McGhee & Robin Moore." Robin Moore (Moore) is the author or coauthor of such best-selling books as "The Green Berets," "The French Connection" (coauthor), and "The Happy Hooker" (coauthor), all three of which became highly successful motion pictures. Moore often used coauthors and ghostwriters to write books.

During early 1976, Howard Liss (Liss), a ghostwriter used by Moore, accompanied Moore to the office of Jack Klein (Klein), Moore's accountant, where a discussion occurred involving tax shelters.

Moore had copyrighted 14 books in the 5 years 1971 through 1975. "The Chinese Ultimatum" was one of 24 books subject to copyright in Moore's name in 1976. Many more books were subject to copyright under Moore's name in subsequent years.

### *Babbitt Tax Shelter Department*

Babbitt, Meyers & Co. (Babbitt) was a regional member firm of the New York Stock Exchange, with its headquarters in Pittsburgh, PA, and with branch offices located throughout

western Pennsylvania. During 1976, Robert E. Rose (Rose) was the manager of Babbitt's tax shelter department. His function was to seek out, review, and coordinate the distribution of tax advantaged investments to Babbitt's customers.

Babbitt's practice was to enter into an agreement on behalf of a partnership to be formed. If the offering was successful, the legal formalities of organizing a partnership were followed.

In late 1975 or early 1976, Babbitt began the development of tax shelter programs using books. Since neither Rose nor anyone else at Babbitt had any expertise in the publishing industry, Rose discussed the development of this program with George Mack (Mack) and others. Mack introduced Babbitt to the law firm of Regan, Goldfarb, Heller, Wetzler & Quinn (Regan Goldfarb), New York, NY. Marty Heller, of Regan Goldfarb, represented Moore. Heller introduced Rose to Moore in January or February 1976. Babbitt used Regan Goldfarb in developing book tax shelter programs. In 1976, Babbitt syndicated at least three limited partnerships which utilized paperback books bearing the names of Moore and different coauthors.

*Chinese Ultimatum Co. Private Placement Memorandum*

Babbitt offered $200,000 of limited partnership interests in the Chinese Ultimatum Co. by a private placement memorandum dated April 1, 1976. The Chinese Ultimatum Co. was established in the manner described in this memorandum. The memorandum stated in pertinent part that:

THIS INVESTMENT IS AVAILABLE ONLY TO THOSE OFFEREES (i) WHOSE NET WORTH, EXCLUSIVE OF HOME AND PERSONAL EFFECTS, IS AT LEAST $200,000, OR (ii) SOME PORTION OF WHOSE CURRENT ANNUAL GROSS INCOME WOULD BE SUBJECT TO FEDERAL INCOME TAX AT A RATE OF 50% OR HIGHER AND WHOSE NET WORTH, EXCLUSIVE OF HOME AND PERSONAL EFFECTS, IS $100,000 OR MORE. * * *

*Offering*: $200,000 of Limited Partnership Interests to be offered by Babbitt, Meyers & Co. as exclusive agent for the Partnership; 25 Limited Partnership Interests of $8,000 each. Minimum purchase is one Limited Partnership Interest and requires (i) the payment of $3,000 in cash at the time of subscription, and (ii) the execution of a negotiable promissory note in the principal amount of $5,000 due on January 15, 1977. * * *

*Partnership Business*: The acquisition, publication and other exploitation of the copyright to and the manuscript entitled THE CHINESE ULTIMATUM written by ROBIN MOORE with EDWARD MAINGET HARPER * * *

*Compensation to General Partner*: The General Partner will be paid a guaranteed initial management fee of $2,000 in 1977 which he will contribute to the capital of the Partnership. * * *

*       *       *       *       *       *       *

*Purchase Price and Leverage*: The Partnership will purchase the Work for $812,500, of which an aggregate of $125,000 is payable in cash and a short-term nonrecourse promissory note and the balance of $687,500 by delivery of the Partnership's 7-year, 8% nonrecourse purchase money note with required prepayments (i) to December 31, 1976, out of 100% of Partnership receipts attributable to the publication or other exploitation of the copyright and the Work associated therewith after the first $2,000 of such Partnership receipts, to pay accrued interest to December 31, 1976, and out of 50% of Partnership receipts in excess thereof to pay principal on the Partnership's 7-year nonrecourse note, (ii) from January 1, 1976 to April 30, 1977 (assuming a closing on May 15, 1976) out of 100% of such Partnership receipts to the extent of accrued interest on such 7-year nonrecourse note for such period and out of 50% of such Partnership receipts to pay principal on such note and (iii) thereafter out of 50% of such Partnership receipts to be applied first to the payment of interest on such 7-year nonrecourse note and then to the principal thereof. In addition, the Partnership may prepay interest in the amount of $4,250 * * *

*       *       *       *       *       *       *

*Application of proceeds*:

| | |
|---|---:|
| Gross proceeds | $200,000 |
| Less selling commissions | 30,000 |
| Amount available for partnership | 170,000 |
| Cash payment for work | 125,000 |
| Guaranteed management fee | 2,000 |
| Legal fee | 15,000 |
| Accounting fee | 2,500 |
| Interest on 6% nonrecourse note | 4,250 |
| Working capital | 21,250 |
| Total application of proceeds | 200,000 |

*       *       *       *       *       *       *

The Partnership will secure its short-term nonrecourse promissory note in the amount of $100,000 due on January 31, 1977 to be delivered to the seller of the Work, by all of the investors' negotiable promissory notes. In addition, the Seller will be granted a security interest in the Work as collateral for the due payment of the Partnership's short-term and long-term nonrecourse notes. Thus, if the Partnership is unable to pay its short-term note to the

seller of the Work, the Work will revert to the Seller. Such a reversion would constitute a disposition of the Work by the Partnership and would have a materially adverse effect on the Partnership including materially adverse tax consequences on the investors.

Babbitt, Meyers & Co. * * * as exclusive agent for the Partnership, * * * will receive aggregate commissions of $30,000.

*     *     *     *     *     *     *

In any event, only a small percentage of all literary properties result in sales sufficient to return a profit * * * there is a substantial degree of risk that exploitation of the Work will not yield profits to the Partnership and the Limited Partners, and that investors may not recoup * * * their capital contributions * * *

*     *     *     *     *     *     *

The ultimate commercial success of the Work's publication will depend in large part on the quality of the Publisher of the Work and its ability to obtain sufficient retail shelf space * * *

*     *     *     *     *     *     *

the Publisher would be required to effect sales of approximately 2,380,000 copies (at a cover price of $1.95 each) of the Work for the royalties payable to the Partnership to be sufficient for the Limited Partners to recover their capital contributions and approximately 7,515,000 copies (at a cover price of $1.95 each) for the royalties payable to the Partnership to be sufficient to pay the principal and related interest on the Partnership's 8% nonrecourse purchase money note in the amount of $687,500.[3] For the year ended December 31, 1975, approximately ten literary properties of a type similar to the Work were published as paperback originals of which approximately four sold 1,000,000 copies and one sold 2,000,000 copies or more and none of which sold more than 5,000,000 copies.

*     *     *     *     *     *     *

The Partnership and its publisher will be in competition with numerous other literary property owners and publishers which have substantial financial resources, large distribution staffs and long established histories of publication of paperback originals, none of which may be possessed by the Partnership or its publisher.

*     *     *     *     *     *     *

The General Partner previously has not been a general partner of or investor in limited partnerships * * * nor has he had prior experience in the publication or other exploitation of literary properties. * * *

---

[3]These projections are based on a 10-percent royalty on a sales price of $1.95 per copy.

The synopsis of the work to be purchased entailed 5½ lines in the private placement memorandum.

At least 26 of the 62 numbered pages of the private placement memorandum were devoted to the tax aspects of the transaction. In addition, Exhibit A contained 16 pages of tax projections and Exhibit C was a 47-page legal opinion about Federal income tax consequences.

The private placement memorandum contained a number of schedules entitled "PROJECTED NET AFTER TAX BENEFIT PER UNIT." Those were based upon payments of $3,000 in 1976 and of another $5,000 in 1977 and were listed in a column captioned "Investment." These schedules included data as shown on page 87.

### Petitioners' Subscription of Interest in Chinese Ultimatum Co.

Babbitt solicited petitioners and others to purchase interests in Chinese Ultimatum Co. After receipt of the private placement memorandum, each petitioner signed a document captioned "SUBSCRIPTION AGREEMENT AND INVESTMENT LETTER." Each petitioner agreed to make a $3,000 downpayment to the Chinese Ultimatum Co.'s escrow account, to execute a promissory note in the amount of $5,000 due on January 15, 1977, and to deliver executed copies of the Certification Signature Page. On May 7, 1976, each petitioner executed a document captioned "CERTIFICATION SIGNATURE PAGE." Apparently, on the same day, each petitioner executed a $5,000 promissory note and paid $3,000 to Babbitt by a check dated prior to May 7, 1976.

Petitioners also executed private placement questionnaires, which referred to their "participation in tax shelter offerings," and stated that their net worth was at least $200,000, their annual income was at least $50,000, and they were in a Federal income tax bracket of at least 50 percent.

The final $5,000 payments were made by each petitioner in January 1977 to Babbitt. Each petitioner acquired a 3.96-percent interest in Chinese Ultimatum Co.

| Projected copies sold / Year | Investment | Taxable income or (loss) | Tax savings (detriment) at 50% bracket | Cash-flow | Net after tax benefits (detriment) from investment | |
|---|---|---|---|---|---|---|
| | | | | | Current | Cumulative |
| **102,565** | | | | | | |
| (minimal revenue) | | | | | | |
| 1976 | $3,000 | ($15,105) | $7,552 | 0 | $4,552 | $4,552 |
| 1977 | 5,000 | (14,426) | 7,213 | $36 | 2,249 | 6,801 |
| 1978 | 0 | (665) | 332 | 7 | 339 | 7,140 |
| 1979 | 0 | (730) | 365 | 7 | 372 | 7,512 |
| 1980 | 0 | (730) | 365 | 7 | 372 | 7,884 |
| 1981 | 0 | (730) | 365 | 7 | 372 | 8,256 |
| 1982 | 0 | (730) | 365 | 7 | 372 | 8,628 |
| 1983 | 0 | 26,810 | (13,405) | 497 | (12,908) | (4,280) |
| Totals | 8,000 | (6,306) | 3,152 | 568 | (4,280) | (4,280) |
| **2,380,000** | | | | | | |
| (number needed to | 1976 3,000 | (8,206) | 4,103 | 3,414 | 4,517 | 4,517 |
| cover cash payments | 1977 5,000 | (8,367) | 4,183 | 3,017 | 2,200 | 6,717 |
| made by partners) | 1978 0 | (505) | 252 | 165 | 417 | 7,134 |
| | 1979 0 | (552) | 276 | 183 | 459 | 7,593 |
| | 1980 0 | (552) | 276 | 183 | 459 | 8,052 |
| | 1981 0 | (552) | 276 | 183 | 459 | 8,511 |
| | 1982 0 | (552) | 276 | 183 | 459 | 8,970 |
| | 1983 0 | 20,490 | (10,245) | 673 | (9,572) | (602) |
| Totals | 8,000 | 1,204 | (603) | 8,001 | (602) | (602) |
| **7,515,000** | | | | | | |
| (number needed to | 1976 3,000 | 9,817 | (4,908) | 12,336 | 4,428 | 4,428 |
| cover Chinese | 1977 5,000 | 9,656 | (4,828) | 11,939 | 2,111 | 6,539 |
| Ultimatum Co.'s | 1978 0 | 144 | (72) | 404 | 332 | 6,871 |
| $687,500 | 1979 0 | 228 | (114) | 478 | 364 | 7,235 |
| nonrecourse note) | 1980 0 | 267 | (133) | 497 | 364 | 7,599 |
| | 1981 0 | 307 | (153) | 517 | 364 | 7,963 |
| | 1982 0 | 349 | (174) | 538 | 364 | 8,327 |
| | 1983 0 | 432 | (216) | 1,095 | 879 | 9,206 |
| Totals | 8,000 | 21,200 | (10,598) | 27,804 | 9,206 | 9,206 |

## Chinese Ultimatum Co.

The Chinese Ultimatum Co. was formed by Babbitt in the manner described in the private placement memorandum.

One of the persons interested in "The Chinese Ultimatum" transaction was Moore. In December 1975, Klein, acting on behalf of Moore, asked Jack Letheren (Letheren) to serve as a consultant on a project. Moore and Letheren had at least one prior business dealing since Moore, Letheren, and another person were to share in sums due in connection with the publication of a book entitled "Valency Girl." Moore hired Letheren to prepare a narrative report captioned "Current Practices and Conditions in the Paperback Industry" and to obtain three appraisals for "The Chinese Ultimatum." The narrative report, dated April 7, 1976, was sent to Rose at Babbitt. Rose had Letheren give a preliminary appraisal of "The Chinese Ultimatum" based on an outline of the book. Letheren's preliminary appraisal showed "The Chinese Ultimatum" as having a fair market value of approximately $1 million.

Babbitt used Regan Goldfarb to prepare a form "endorsement letter" which Letheren forwarded to three appraisers. The appraisers, Jill Hausrath, Herbert J. Moore, and Roger M. Darnio, filled in the blanks. By three separate letters, dated April 13, 1976, addressed to Chinese Ultimatum Co., each "appraiser" represented in prepared, identical language that "the present fair market value of the Work is at least equal to the purchase price of $812,500 plus the contingent payment from release of the motion picture based on the Work." Jill Hausrath, Herbert J. Moore, and Letheren were engaged in business together as Jack Letheren & Associates from about 1975 to 1979. Stanley B. Stetzer (petitioners' expert witness) began working with Letheren in 1976.

James C. Blackman (Blackman), a lawyer located in a small town about 130 miles from Babbitt, was selected by Babbitt to be the general partner of Chinese Ultimatum Co. He had no experience in the publishing or movie industries. He served as a general partner to facilitate the formation of the partnership for Babbitt's tax shelter department. Blackman did not take part in any transactions relating to the acquisition of "The Chinese Ultimatum" nor with the publishing company. Black-

man merely reviewed and signed documents sent to him by Sally Diehl, an employee of Babbitt, or by Regan Goldfarb. Robert C. Arthurs (Arthurs), a general partner of Babbitt, sometimes functioned in the guise of B.M.C. Management Corp., a wholly owned subsidiary of Babbitt. Arthurs did all the bookkeeping for Chinese Ultimatum Co. During all relevant times, Arthurs managed 20 to 25 tax shelters.

The 1976 Federal partnership return reported that Chinese Ultimatum Co. commenced business on May 1, 1976. On May 20, 1976, a certificate of limited partnership regarding Chinese Ultimatum Co. was signed by Blackman as general partner and as the attorney-in-fact for each limited partner. On June 16, 1976, a copy of the certificate of limited partnership was filed with the State of Delaware.

### Acquisition of Rights to "The Chinese Ultimatum" by Chinese Ultimatum Co.

Chinese Ultimatum Co. obtained all of the worldwide rights to "The Chinese Ultimatum" by an agreement dated June 17, 1976, signed by Moore, on behalf of Harper and himself as the "Sellers," and by Blackman, for Chinese Ultimatum Co., as the "Purchaser." These rights included motion picture, television, and commercial rights. All payments to Sellers were to be made to Klein. Under the agreement, Chinese Ultimatum Co. was to enter into a contract whereby a publisher would publish "The Chinese Ultimatum" as a "paperback original" by September 1976, pay Chinese Ultimatum Co. not less than 10 percent of the cover price of all such paperbacks sold, exclusive of returns, and pay royalties due with respect to sales through October 31, 1976, not later than December 31, 1976.

The agreement provided in part that:

12(a) In consideration of the rights and property sold to Purchaser hereunder, Purchaser agrees to pay to Sellers the sum of Eight Hundred Twelve Thousand, Five Hundred Dollars ($812,500.00) payable as follows:

(i) The sum of Twenty-Five Thousand Dollars ($25,000.00) at the closing by bank or certified check.

(ii) By delivery to the Sellers at the closing of a nonrecourse promissory note of the Purchaser in the amount of One Hundred Thousand Dollars ($100,000.00) bearing interest at six percent (6%) per annum and payable on January 31, 1977 with all interest due on this note to be paid on January 31,

1977 provided that Purchaser shall have the right to prepay said interest at any time without penalty.

(iii) The balance of the purchase price by delivery to Sellers at the closing of a non-recourse promissory note (the "Note") of the Purchaser in the amount of Six Hundred Eighty-Seven Thousand Five Hundred Dollars ($687,500.00) in the form annexed hereto as Exhibit "A."

(b) As security for the payment of the note referred to in (ii) of paragraph 12(a) above, the Purchaser hereby grants to Sellers a security interest in all of the recourse notes executed by the limited partners of the Purchaser in partial payment of their capital contributions to the limited partnership.
\* \* \*

\*      \*      \*      \*      \*      \*      \*

(e) In the event a motion picture is produced based wholly or in part on the Property, then in addition to the above mentioned payments, Purchaser will pay to the Sellers a sum equal to five percent (5%) of Purchaser's share of the gross receipts or net profits of the said motion picture, as the case may be, earned by the said motion picture within two (2) years of the general release of the picture in the United States of America.

\*      \*      \*      \*      \*      \*      \*

[(f)(i)] When the [$687,500 nonrecourse] Note becomes due and payable upon maturity, if there remains any unpaid principal amount and accrued interest thereon Sellers shall be entitled to repossess the Property securing the Note and recover legal title thereto and Purchaser shall have no further interest in the Property or the receipts thereof. Sellers shall have no recourse whatsoever against the Purchaser, the Purchaser's other assets or the General or Limited Partners in the event of a default in the payment of the Note.

\*      \*      \*      \*      \*      \*      \*

[13(b)] The share of the gross receipts received by Purchaser shall, after making the payments set forth in paragraph 12(e) above, be applied as follows:

(i) From the closing date to and including December 31, 1976 one hundred percent (100%) of such gross receipts in excess of the first Two Thousand Dollars ($2,000.00) will be paid to the Sellers to the extent of interest due on the Note for the period from the closing date to and including December 31, 1976. During the said period from the closing date to and including December 31, 1976 fifty percent (50%) of the balance of such gross receipts in excess of the said sum of Two Thousand Dollars ($2,000.00) and all of the foregoing interest paid to Sellers shall be paid to Sellers in reduction of the principal of the Note and fifty percent (50%) of such gross receipts shall be retained by the Purchaser.

(ii) From January 1, 1977 through and including April 30, 1977, one hundred percent (100%) of the gross receipts shall be paid to the Sellers to the extent of interest due on the Note for such period and previously accrued

but unpaid interest. After all such interest has been paid to the Sellers, fifty percent (50%) of gross receipts shall be paid to Sellers and fifty percent (50%) of such gross receipts shall be retained by the Purchaser, it being agreed that any such payments to Sellers shall be deemed first credited to interest and then to principal. Purchaser shall make such payments to Sellers of Sellers' share of the gross receipts (as set forth in subdivision (i) of this subparagraph (b)) on July 1 and December 1 of each year in respect of all receipts received during such periods commencing with the first publication of the Property. * * *

* * * * * * *

20. * * * the Sellers have agreed to pay to George Mack in consideration of Mr. Mack introducing the Sellers to the Purchaser a finders fee in the amount of Twenty-Five Thousand Dollars ($25,000.00) * * *

The $687,500 figure for the nonrecourse note was derived by multiplying 5.5 times the $125,000 cash payment. This formula was used by Babbitt with respect to a number of books bearing Moore's name involved in limited partnerships syndicated by Babbitt.

Two nonrecourse promissory notes payable to Moore and Harper, dated June 17, 1976, were executed by Blackman on behalf of the Chinese Ultimatum Co. as part of the closing. The first note was for $100,000 payable on January 31, 1977, together with interest at 6 percent per annum on the unpaid balance. Pursuant to the agreement, this note was secured by the recourse notes of the limited partners. This note was paid to Moore and Harper in accordance with its terms, including $3,747.95 as interest.

The second nonrecourse note for $687,500 was due on June 17, 1983, with interest at 8 percent on the balance outstanding. The nonrecourse note was payable solely out of gross receipts and essentially repeated the payment provisions set forth above in paragraph 13(b) of the June 17, 1976, agreement. If there were no payments against principal, interest would accrue on the second note in the amount of $385,000.

## The Publisher and Chinese Ultimatum Co.

Prior to Chinese Ultimatum Co.'s acquisition of "The Chinese Ultimatum," Moore had contacted Andrew Ettinger (Ettinger), vice president of Pinnacle Books Inc. (Pinnacle),

with respect to several books, including "The Season" and the "The Chinese Ultimatum."

During 1976, Pinnacle was in the bottom third of the 18 mass-market paperback publishers. Pinnacle then held about a 2-percent market share, generated $7 to $8 million in sales, and published at least 144 titles of the approximately 3,000 paperbacks published annually.

Ettinger was willing to publish "The Chinese Ultimatum" even though two books bearing Moore's name and coauthored by Liss, which previously were published by Pinnacle, were not successful. These books were "The London Switch," which had final net sales of 37,000, and "The Italian Connection," which had only 20,000 in net sales. Eventually Mack, Rose, and others entered into the discussions with Ettinger about "The Chinese Ultimatum."

On March 10, 1976, a manuscript of "The Chinese Ultimatum" was delivered to Pinnacle. An agreement naming Chinese Ultimatum Co. as the "Author" and Pinnacle as the publisher was dated March 3, 1976. After changing the dates on which post-1976 royalty statements were due, that agreement was redated June 17, 1976, and signed by Pinnacle and by Blackman on behalf of Chinese Ultimatum Co.

The agreement provided for a $12,500 advance against all earnings from a 10-percent royalty on the retail price of all original paperback copies sold. Pinnacle paid the $12,500 advance to Chinese Ultimatum Co. The agreement also included a provision in which Pinnacle was to get 10 percent of the revenues derived by Chinese Ultimatum Co. from motion picture and television rights. It was not customary in the mass-market industry to make royalty payments for the period from publication through October 31, 1976, by December 31, 1976. Pinnacle nevertheless agreed to make such payments to Chinese Ultimatum Co.

Pinnacle promoted "The Chinese Ultimatum" as an original paperback book to the best of its efforts.

### Receipts From "The Chinese Ultimatum"

"The Chinese Ultimatum" was originally published by Pinnacle in September 1976 with an initial print of 244,000 copies. At the time of its publication in 1976, "The Chinese Ultimatum" was reviewed in The Chicago Tribune, The Los

Angeles Times, Cue magazine, Bestsellers, and Publisher's Weekly. It was featured in a full page advertisement in Publisher's Weekly in the August 16, 1976, edition. New cover art was used when 50,410 copies of "The Chinese Ultimatum" were republished by Pinnacle in November 1978, and the price was increased from $1.95 to $2.25 "The Chinese Ultimatum" was distributed throughout the United States and Canada by Independent News Co., a wholly owned subsidiary of Warner Communications, Inc. The book also had some export sales and sales to U.S. military posts which were also handled by Independent News.

"The Chinese Ultimatum" was published in six foreign editions between 1976 and 1979: a soft cover Spanish language edition published in December 1976 by Sedmay Ediciones, Madrid, Spain; a hard cover Japanese language edition published in 1977 by Rippo Shobo, Tokyo, Japan; a soft cover German language edition published in March 1978 by Wilhelm Goldman Verlag, Munich, Germany; a soft cover Dutch language edition published in 1978 by Nieuwe Wieken, Amsterdam; a soft cover English edition published in 1978 by Sphere Books, Ltd., London; and a hard cover English edition published in 1979 by Severn House Publishers, Ltd., London. All of the foreign editions of "The Chinese Ultimatum" provided $4,742.50 in royalties to the partnership.

The most current royalty figures provided by Pinnacle to Chinese Ultimatum Co. for sales through June 30, 1982, indicated that 298,132 copies of "The Chinese Ultimatum" were distributed, with net sales of 174,266 units, a 58.4-percent sale.

The Chinese Ultimatum Co. also derived revenue from the sales of an option to purchase motion picture rights to "The Chinese Ultimatum." In 1977, Joseph Cates Co., Inc., paid $5,000 for that option. Blackman corresponded with Moore's attorney at Regan Goldfarb in connection with the option negotiations.

During the years 1976 through 1980, Chinese Ultimatum Co. received $35,356.74 in royalties from domestic and foreign book sales. This, together with the $5,000 from the sale of the movie option, totals $40,356.74, all of which should have been paid to Moore and Harper under the terms of the June 17, 1976, agreement. The parties apparently misunderstood this

agreement as to the requirement for complete payment of accrued interest for the period beginning January 1, 1977. On January 7, 1981, Arthurs wrote to Frank Sturges (Sturges), an agent of Moore, that: "According to the sales agreement, the authors are to receive 100 percent of all revenues until May 31, 1977 (in excess of the first $2,000.00) then 50 percent thereafter." In accordance with this understanding, and since payments had not been made on July 1 and December 1 of each year as provided in the agreement, Arthurs made a catchup payment of $20,016.03 to Publishers Marketing Group as Sturges had requested. Publishers Marketing Group is a corporation wholly owned by Moore for purposes of receiving and disbursing such funds. This, together with the $10,500 payment to Moore and Harper by a February 7, 1977, check, meant that a total of $30,516.03 was paid to them as interest on the $687,500 nonrecourse note.

### Valuation of "The Chinese Ultimatum"

An April 8, 1983, valuation report by petitioner's witness, Stanley B. Stetzer (Stetzer), stated that in his opinion based on potential earnings foreseeable as of the second quarter of 1976 the net proceeds from the sale of all rights to "The Chinese Ultimatum" could reasonably have been expected to be $819,871.25. An October 27, 1982, valuation report by respondent's witness, Robert Sachs (Sachs), estimated a fair market value for "The Chinese Ultimatum" as of April 1976 at $15,000. A December 21, 1982, valuation report by respondent's witness, Stephen Conland (Conland), stated that his opinion was that the fair market value of "The Chinese Ultimatum" as of June 17, 1976, was $2,000. The reports of these three persons indicated the following in comparison to the actual figures through 1980:

| | Stetzer | Conland | Sachs | Actual |
|---|---|---|---|---|
| "The Chinese Ultimatum" paperback | | | | |
| Estimated print | 1,850,000.00 | 125,000.00 | 0 | 296,833 |
| Net sales | 1,655,750.00 | 63,500.00 | 175,000 | 175,537 |
| Return percentage | 10.5% | 50% | none given | 41% |
| Value of book | none given | $2,000.00 | $15,000 | 0 |
| Estimated receipts by Chinese Ultimatum Co. from rights to "The Chinese Ultimatum" | | | | |
| Dollar value of royalties | $322,871.25 | $10,312.50 | $35,438 | $30,614 |
| Book club sales | 65,000.00 | 0 | 0 | 0 |
| Foreign language receipts | 38,500.00 | 0 | [4]6,000 | 4,743 |
| Serial excerpts | 18,500.00 | 0 | 0 | 0 |
| Motion picture receipts | 375,000.00 | 0 | 0 | 5,000 |
| Total | 819,871.25 | 10,312.50 | 41,438 | 40,357 |

On June 17, 1976, net sales of "The Chinese Ultimatum" would at best be expected to be 175,000 copies. The value of other rights on that date was so speculative as to be unable to be estimated. On June 17, 1976, estimated receipts from all the rights to "The Chinese Ultimatum" did not exceed $42,000, and the value of such rights was significantly less than $42,000. On that date, there was no possibility that Chinese Ultimatum Co. would generate enough revenues to return petitioners' cash payments and that the nonrecourse note would be paid by its due date.

### Chinese Ultimatum Co.'s Reported Losses

Chinese Ultimatum Co. was a cash basis taxpayer and filed partnership returns for years ending December 31. For years 1976 through 1978, Chinese Ultimatum Co. elected the income forecast method of depreciation. The partnership returns, Forms 1065, filed with the Internal Revenue Service by Chinese Ultimatum Co. for 1976 through 1978, reported the following:

[4]This figure is shown on the Sachs report as the value of subsidiary rights income. We put the figure on this line for purposes of comparison since Sachs did not believe any value should be placed on motion picture receipts.

|                              | 1976      | 1977      | 1978      |
|------------------------------|-----------|-----------|-----------|
| Gross receipts               | $19,675   | $11,976   | $1,790    |
| Interest income              | 0         | 1,439     | 2,457     |
| Other income                 | 251       | 0         | 0         |
| Total income                 | 19,926    | 13,415    | 4,247     |
| Interest expense             | 0         | 14,248    | 0         |
| Distribution expense         | 0         | 356       | 0         |
| Depreciation                 | 359,597   | 131,600   | 125,687   |
| Organization expense         | 0         | 6,500     | 0         |
| Management fee               | 0         | 2,000     | 0         |
| Other deductions             | 5,194     | 676       | 662       |
| Service and management fees  | 0         | 0         | 500       |
| Total deductions             | 364,791   | 155,380   | 126,849   |
| Ordinary loss                | (344,865) | (141,965) | (122,602) |

Each petitioner paid Babbitt $3,000 in 1976 and $5,000 in 1977 for a 3.96-percent interest in Chinese Ultimatum Co. Petitioner Fuchs deducted partnership losses from Chinese Ultimatum Co. in 1977 and 1978 in the amounts of $5,622 and $4,855, respectively.[5] Petitioner Genstein deducted partnership losses from Chinese Ultimatum Co. in 1976, 1977, and 1978 in the amounts of $13,657, $5,622, and $4,855, respectively. Respondent disallowed all these deductions.

### OPINION

Petitioners claim Chinese Ultimatum Co. was engaged in business for profit and that it was entitled to an interest deduction in 1977. Respondent contends, among other things, that Chinese Ultimatum Co. did not conduct its activities for profit and that it was not entitled to interest deductions on nonrecourse notes.

### I. Section 183

At the outset, we accept the fact that Pinnacle, as the publisher, fully utilized its resources as a small mass-marketing publishing house to sell "The Chinese Ultimatum." Accordingly, we have not dwelt extensively upon that aspect of this case in our findings of fact. Our inquiry is not directed, as petitioners would have us believe, to the question of whether

---

[5]Petitioner Fuchs also received a $13,657 distributable loss from the Chinese Ultimatum Co. for 1976, but that taxable year of petitioner Fuchs is not before the Court.

Pinnacle did its job. The first critical question before us is whether the partnership, Chinese Ultimatum Co., was an activity engaged in for profit within the meaning of section 183.[6]

An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1).

It is well established that: (1) Section 183 is not a disallowance section; (2) section 183 allows a limited partner to take deductions otherwise not allowable where the partnership is not engaged in a trade or business under section 162 or in an activity not encompassed by paragraphs (1) and (2) of section 212; and (3) the question of whether the partnership is "not engaged in for profit" under section 183 is determined at the partnership level. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. sub nom. *Kratsa v. Commissioner*, in an unpublished order 734

---

[6]Sec. 183 provides in part as follows:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

F.2d 6 (3d Cir. 1984), affd. sub nom. *Hook v. Commissioner*, in an unpublished order 734 F.2d 5 (3d Cir. 1984);[7] *Brannen v. Commissioner*, 78 T.C. 471, 499–500, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659, 696–698 (1982). Thus, petitioners' argument that they invested in the Chinese Ultimatum Co. with a bona fide objective to make a profit is of little significance to our analysis under the instant facts since a limited partner has no control over partnership activities or the business deductions of the partnership. *Brannen v. Commissioner, supra; Fox v. Commissioner, supra; Resnik v. Commissioner*, 66 T.C. 74, 81 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977).

Petitioners must show that Chinese Ultimatum Co. engaged in the exploitation of the rights to "The Chinese Ultimatum" with the "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, Chinese Ultimatum Co.'s actual and honest objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. at 1006. Section 1.183–2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit.

The issue is one of fact to be resolved not on the basis of any one factor, but on the basis of all the facts and circumstances. *Allen v. Commissioner*, 72 T.C. 28, 34 (1979); *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976). Greater weight is given to objective facts than to the parties' mere statement of their intent. *Siegel v. Commissioner, supra* at 699; *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

In determining Chinese Ultimatum Co.'s intent, we focus on the intent of the general partner and the promoters of Chinese Ultimatum Co. since it is these individuals who actually controlled the partnership's activities. *Fox v. Commissioner*, 80 T.C. at 1007–1008. In this case, it is clear that Babbitt organized and controlled Chinese Ultimatum Co. Blackman was only a strawman for Babbitt which carried on most of the duties of the general partner.

---

[7] An appeal of this case would lie to the Third Circuit.

Based on the record before us, we are convinced that Babbitt organized Chinese Ultimatum Co. as a limited partnership in order to create artificial losses which the limited partners could use to reduce their taxes. The essence of this transaction was to transfer all rights to "The Chinese Ultimatum" for 7 years to the partnership for a grossly inflated price in the form of an outright sale, to use the facade of the distribution of an original paperback book via Pinnacle, and to use a grossly exaggerated nonrecourse note to create large tax losses for the limited partners through unwarranted depreciation deductions.

Babbitt attempted to paper as a business activity the formation and operation of Chinese Ultimatum Co. Some of this paper was specious, as in the case of the three identical appraisals Letheren supplied to Babbitt. Babbitt made sure, contrary to normal publishing practices, that the initial royalties would be paid before December 31, 1976, so that a loss could be claimed in 1976 under the income forecast method of depreciation. See *Siegel v. Commissioner, supra* at 693. In addition, Babbitt puffed up the depreciation deductions by an excessive nonrecourse note which bore no relationship to reality other than that it equaled 5.5 times the cash payments made to Moore and Harper, the same factor used by Babbitt with respect to a number of books bearing Moore's name.

Petitioners' expert witness so exaggerated his estimates of the value of the rights to "The Chinese Ultimatum" that his testimony was incredible, i.e., not credible. We found Sachs, one of respondent's expert witnesses, the most impressive in terms of his knowledge of the book business and valuation of the prospects of "The Chinese Ultimatum" as of June 1976. We are satisfied that on June 17, 1976, it was obvious that at best "The Chinese Ultimatum" would have modest net sales of about 175,000 copies. Sachs estimated revenues at $41,438 which was within 3 percent of the stipulated actual receipts. Most of the other rights were without value and the movie rights were so speculative as to be incapable of being valued. It is obvious that the value of all rights to "The Chinese Ultimatum" was significantly less than $42,000. We question whether, aside from tax motivations, Chinese Ultimatum Co. or anyone else in an arm's-length transaction would agree on a price of $812,500 for a return of $42,000. We are convinced

that the Chinese Ultimatum Co. transactions were not economically sound and lacked a commercial objective.

We can contrast what happened here with what would have happened in a straight economic transaction if Moore and Harper had contracted directly with Pinnacle. Moore and Harper would have received a total of $40,356.74 through 1980. Instead, via Chinese Ultimatum Co., Moore and Harper received $114,247.95 within 8 months after the June 17, 1976, agreement date and should have received a total of $134,263.98 by January 1981. The interposition of Chinese Ultimatum Co. only served to fatten the purses of Moore, Harper, Babbitt, Regan Goldfarb, and others by offering unwarranted paper losses to limited partners.

The factual sequence can be simplified. Moore had Harper write a book for publication as a paperback original. Moore contacted Pinnacle to have it publish a mass-market paperback original. Pinnacle was willing to sign the requisite documents with a limited partnership.

Moore, Babbitt, Regan Goldfarb, and others engaged in a cooperative effort to set up the tax scheme known as the Chinese Ultimatum Co. The private placement memorandum demonstrates that the sole purpose of Chinese Ultimatum Co. was to create substantial after-tax benefits in 1976 and 1977, no matter how many book sales actually occurred. Under the facts of this case, the only conclusion that could be drawn in June 1976 was that these after-tax benefits would be substantial paper losses used to reduce other income of the limited partners.

Pinnacle published the original paperback after Moore and Harper purportedly transferred *all* their rights in "The Chinese Ultimatum" to Chinese Ultimatum Co. Nevertheless, over 75 percent of the $40,356.74 of royalties and movie-option income flowed to Moore and Harper during the time these rights were held by Chinese Ultimatum Co. As anticipated, most of the revenues were derived in the first 2 years.

There was no prospect whatsoever that the $687,500 nonrecourse note would be paid off on or before June 17, 1983. The only payments made by date of trial were nonsubstantial payments against interest due on that nonrecourse note and these were not such as to lend economic substance to that nonrecourse note.

In summary, based upon the facts in this record, petitioners have failed to sustain their burden of showing that Chinese Ultimatum Co. was engaged in the exploitation of the rights to "The Chinese Ultimatum" for profit. Accordingly, all deductions claimed by petitioners, other than interest expenses in 1977, are allowable only to the extent that gross income exceeds the deductions allowable under section 183(b)(1).

Since there were no section 183(b)(1) deductions in 1976 and 1978, there were no distributable losses in 1976 and 1978. Accordingly, respondent's determination is sustained as to 1976 and 1978.

## II. Section 163

For 1977, Chinese Ultimatum Co. claimed a total interest deduction of $14,248 which included $10,500 as interest on the $687,500 nonrecourse note. We agree with respondent that this $10,500 was not deductible interest under section 163.[8]

To qualify for a section 163 deduction, the taxpayer must pay for the use or forebearance of money upon a genuine indebtedness. *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); *Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; *Fox v. Commissioner*, 80 T.C. at 1019–1020. This Court explained in *Fox v. Commissioner*, 80 T.C. at 1019, that "there are various approaches which may be taken in establishing whether a purchaser may treat a nonrecourse liability as a bona fide debt." The approach we follow is the one recently stated in *Flowers v. Commissioner*, 80 T.C. 914, 942 (1983), as follows:

Where both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no "genuine indebtedness" exists and no "investment in the property" occurs. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Odend'hal v. Commissioner*, 80 T.C. 588, 604 (1983); *Hager v. Commissioner*, 76 T.C. 759, 788 (1981); *Narver v. Commissioner*, 75 T.C. 53

---

[8]Also included in the total claimed deduction was $3,748, the rounded-off amount representing $3,747.95 of interest paid on the $100,000 note. In light of our findings, we deem it unnecessary to consider whether the $3,748 is deductible under sec. 163 since it is less than the reported gross income of $13,415.

(1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982).

Here, too, both the purchase price and the $687,500 nonrecourse note unreasonably exceeded the value of the property acquired.[9]

We have found that on June 17, 1976, the maximum estimated receipts from all rights to "The Chinese Ultimatum" totaled $42,000, and the value of such rights was substantially less than that amount. We contrast that with the purchase price of $812,500 and the nonrecourse note of $687,500. It is obvious that both the purchase price and the $687,500 nonrecourse obligation were both grossly inflated and far in excess of the value of the rights to "The Chinese Ultimatum." We have discussed above the tax factors motivating the structuring of the Chinese Ultimatum Co.'s activities and showing the artificial nature of the $687,500 nonrecourse note. Suffice it to say that that note is not a genuine indebtedness and does not support Chinese Ultimatum Co.'s claimed interest deduction.[10] Accordingly, there was no dis-

---

[9]We note that in *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in *Hager v. Commissioner*, 76 T.C. 759, 733–774 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide which test is appropriate on the facts before us (see *Brannen v. Commissioner*, 78 T.C. at 513–514 (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the rights to "The Chinese Ultimatum."

[10]Our conclusion is not changed by the opinion of the Supreme Court in *Commissioner v. Tufts*, 461 U.S. 300 (1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the nonrecourse obligation in the amount realized by him. That case involved the symmetrical treatment to be accorded where nonrecourse liability has been properly included in basis, initially, and must thereafter also be included in the amount realized on disposition of the encumbered property. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the nonrecourse loan should be treated as a true debt in that situation.

The instant case does not fit within the context of *Tufts* and *Crane v. Commissioner*, 331 U.S. 1 (1947). Our issue is whether or not the nonrecourse obligation is genuine indebtedness so that it can be properly included in basis at the front end of the transaction. We have found that it was not genuine indebtedness and could not properly be included in the basis of the rights to "The Chinese Ultimatum." Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness at the outset. That was not the fact in either *Tufts* or *Crane. Fox v. Commissioner*, 80 T.C. 972, 1023 n. 25 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. sub nom. *Kratsa v. Commissioner*, in an unpublished order 734 F.2d 6 (3d Cir. 1984), affd. sub nom. *Hook v. Commissioner*, in an unpublished order 734 F.2d 5 (3d Cir. 1984); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 n. 9 (1983), on appeal (4th Cir., Feb. 27, 1984).

tributable loss for 1977, and respondent's determination for that year is sustained.

When we view this case as a whole, we can only conclude that the recent statement by the Court of Appeals in *Barnard v. Commissioner*, 731 F.2d 230, 232–233 (4th Cir. 1984), affg. *Fox v. Commissioner, supra,* is apposite:

The long and short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path; if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. We refrain from any expression of opinion as to whether the taxpayers have exposed themselves to the risk of criminal prosecution. However, even assuming that perhaps they have not, they, by their conduct, nevertheless reveal a malaise which a healthy United States of America cannot sanction. It is a frightening prospect when our wealthy citizens, those in the highest income tax brackets, seek to take indefensible advantage of the country and their fellow citizens, especially those who have far less from which to meet their tax responsibilities. [Fn. refs. omitted.]

In light of our disposition of this case, we find it unnecessary to discuss the other arguments raised by respondent in support of the disallowance of petitioners' deductions relating to Chinese Ultimatum Co.

*Decisions will be entered for the respondent.*