BRIAN HOLLAND, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holland v. Commissioner
Docket No. 14787-81
United States Tax Court
T.C. Memo 1985-626; 1985 Tax Ct. Memo LEXIS 7; 51 T.C.M. (CCH) 164; T.C.M. (RIA) 85626; December 26, 1985. *7 Held: Petitioner realized, and must recognize, $135,000 of additional income in 1974 as a result of his purchase of master recordings via an offset against royalties owed him; petitioner's master recordings activity was not engaged in for profit and, therefore, he is not entitled to the claimed depreciation deduction or investment credit; respondent's disallowance of petitioner's claimed deductions for automobile, travel and hotel expenses, partnership losses, alimony, charitable contributions, and tax return preparation fees are sustained. Hallison H. Young, for the petitioner. Beth Williams and Arthur L. Skaar, Jr., for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency of $34,679 in petitioner's 1974 Federal tax return. After concessions, [1] the issues for determination are: (1) Whether a portion of petitioner's accrued royalties were used to purchase master recordings in 1974 and, therefore, must be reported as income in that year; [2] *8 (2) whether petitioner is entitled to a depreciation deduction and/or an investment credit [3] with respect to master recordings; (3) whether petitioner is entitled to any deduction for automobile, travel and hotel expenses under section 162[4] and, where applicable, whether the substantiation requirements of section 274 have been complied with; (4) whether petitioner is entitled to any deduction for his allocable share of losses in three partnerships; (5) whether petitioner is entitled to any deduction for alimony payments; and (6) whether petitioner is entitled to any deduction for charitable contributions or tax return preparation fees. [5] *9 FINDINGS OF FACT Some of the facts have been stipulated. The stipulations and attached exhibits are incorporated herein by this reference. Brian Holland (petitioner), a cash basis, calendar-year taxpayer, resided in Canoga Park, California when the petition herein was filed. In 1974, petitioner was a successful songwriter/composer of national and international acclaim. His career in the record business began in 1961 when he entered a producer's contract with Motown Corporation (Motown) and a songwriter's contract with Jobete Music Company, Inc. (Jobete).In 1963, he entered a recording artist's contract with Motown. Commencing in 1962, petitioner was part of the song writing and producing team of Holland-Dozier-Holand (HDH). This team has been credited with developing the "Motown sound" and wrote for and produced records of many successful groups including the Supremes and the Four Tops. [6] The HDH team, and petitioner individually, received numerous Broadcast Music, Inc. awards *10 for accomplishments as songwriters/producers. During his tenure with Motown, petitioner became Vice President of Quality Control in which position he was responsible for listening to each record to ensure it was of good professional quality. During the mid- to late-sixties, his brother, Edward J. Holland, Jr. (Holland), also a member of the HDH team, was Vice President of Motown. From 1964 through 1968, Holland was also the Artist and Repertoire Director of Motown and was responsible for the direction of specific artists, i.e., selecting the songs, producers, and musicians for the artists' recordings. Petitioner's affiliation with Motown *11 and Jobete terminated in 1968. Thereafter, he worked under contract for the group of companies wholly owned by his brother. These companies include: Stagecoach Productions, Inc. (Stagecoach); Holland-Dozier-Holland Productions, Inc. (HDH Productions); Invictus Records, Inc. (Invictus); and Hot Wax Records, Inc. (Hot Wax). Stagecoach and HDH Productions were under exclusive long-term contracts to Hot Wax and Invictus respectively to produce master recordings. [7] None of Holland's companies had equipment to manufacture records nor did any of them directly market or distribute records. After leaving Motown, petitioner's income decreased. On his 1974 return, petitioner reported gross receipts as a songwriter/producer of $78,092. Although he had a close relationship with his brother, he became dissatisfied with his status as an independent contractor to, rather than part-owner of, Holland's companies. In the hopes of increasing his income, in 1973 he told Holland that he wanted to become a stockholder in Holland's companies. Holland countered with the suggestion that petitioner consider acquisition *12 of master recordings produced by Stagecoach and/or HDH Productions instead. Holland further suggested that petitioner talk with other individuals familiar with the record industry about acquiring master recordings. Acting on this suggestion, petitioner talked with Clarence Tucker (Tucker), the Vice President and general financial manger of Invictus, in late 1973. The substance of this conversation concerned the benefits and detriments of master recording ownership and existing market conditions. At that time, they did not discuss any specific master recordings. Petitioner also discussed the possibility of acquiring master recordings with his attorney, Mr. Patmon, in late 1973. Their conversation touched on the tax benefits which might accrue to petitioner as a result of his acquisition of master recordings. By the end of 1973, petitioner had decided to acquire master recordings. In January 1974, he advised Holland of this decision and Holland suggested that he select for purchase master recordings of two established artists and two artists with potential who were not yet recognized. Further, Holland agreed to sell whatever recordings were selected to petitioner at cost. Petitioner *13 chose the following master recordings: [8]
Artists
Title of Recording
Laura Lee
I Need it Just as Bad as You
If I'm Good Enough to Love (I'm
Good Enough to Marry) [9]
Don't Leave me Starving for Your
Love [10]
(If you Want to Try Love
Again) Remember Me [11]
Chairmen of the Board
Skin I'm In
Earl English [12]
Wanting You (Instrumental)
Wanting You (vocal)
Hi Lites [12]
That's Love (instrumental)
That's Love (vocal) Laura Lee and Chairmen of the Board were established recording *14 artists whereas the selections by Earl English and the Hi Lites were their first commercial releases. Petitioner assumed that each of the artists whose recordings he acquired had an exclusive recording contract with Invictus at the time he purchased the master recordings. [13] Although the recording artist was entitled to a royalty from Invictus on each record sold, petitioner did not know the amount of the artist royalties payable on the master recordings he acquired. Petitioner also did not know the amount of the co-producer royalties payable on sales of records manufactured from five of his master recordings.Petitioner never made or saw any projection of potential earnings from the master recordings he selected for purchase. [14]
As of January 1974, the Holland companies owned petitioner approximately *15 a half a million dollars in songwriter/producer royalties. Petitioner and Holland intended that the purchase price of the master recordings would be paid by an offset against these royalties. Holland and Tucker had earlier discussed a direct offset but Holland determined that the best course would be to execute a formal contract and promissory notes. Tucker obtained contract and promissory note forms from the law firm of Patmon, Young, and Kirk. In January 1974, documents formalizing the oral agreement between petitioner and Holland, acting on behalf of HDH Productions and/or Stagecoach, were executed in the Invictus offices. The transaction documents include: a Master Tape Purchase Agreement; a Bill of Sale; three promissory notes in the amount of $13,500 each; [15] one promissory note in the amount of $94,500 payable in January 1982; a Security and Pledge Agreement; and a Letter of Authorization to Offset Against Royalties. Since Holland had agreed to sell whatever master recordings were selected by petitioner at cost, at no time prior to the formal agreement was price discussed. The $135,000 *16 purchase price was determined by Tucker from the companies' records of production costs. Petitioner did not know how much he had paid for each of the master recordings but assumed he had paid more for those by Laura Lee and Chairmen of the Board. No portion of the $135,000 purchase price was paid in cash. Petitioner's letter authorizing an offset against royalties provided that HDH Productions and/or Stagecoach could: * * * offset against any and all royalties or other monies and considerations due or to become due me pursuant to any such producer's agreement now or hereafter existing between us in payment of any such recourse promissory note(s) heretofore or hereafter delivered by me to you as payment for the purchase price of Master Tapes. In conjunction with the terms of the notes and the Master Purchase Agreement, this authorization did not apply to the $94,500 note. However, the authorization letter language limiting offset to recourse notes was inconsistent with the intent, and subsequent action, of the parties. Limiting the offset to recourse notes was also inconsistent with the instructions given by Tucker to the law firm concerning the terms of the agreement between petitioner *17 and Holland when he requested blank forms to formalize the oral agreement. In 1974, consistent with the parties intent, the full $135,000 purchase price was paid via an offset against a portion of the royalties owed petitioner by Holland's companies. Petitioner never took physical possession of the master recordings he purchased. He also did not insure these master recordings. Under the Security and Pledge Agreement, HDH Productions and Stagecoach were to hold the master recordings as security for payment of petitioner's notes. As discussed above, the notes were all fully paid during 1974. As noted above, HDH Productions, one of the companies which sold petitioner his master recordings, was under exclusive longterm contract to Invictus to produce master recordings. In April 1973, Invictus entered a contract with CBS Records, Inc. (CBS) for the manufacture, distribution, and sale of phonograph records pressed from Invictus master recordings and sold under the Invictus label. [16] *19 The initial term of the agreement was one year with two optional renewal periods of one year each. CBS had extensive experience in the record music industry and had successfully distributed a number of records. *18 In selling master recordings to petitioner, Holland wanted to ensure that the sale did not void CBS's rights. Petitioner was amenable to Invictus' using his master recordings to meet its contractual obligations to CBS. Therefore, in January 1974, petitioner entered a Sub-Pressing Agreement and Sub-Distribution Agreement with Invictus which made petitioner's master recordings subject to the preexisting agreement between Invictus and CBS. As a consequence of the latter agreement, the sole function performed by Invictus in relation to petitioner's master recordings was to make said recordings subject to the agreement with CBS. For this limited function, Invictus was to receive agency fees of 12 percent on single records and 16 percent on albums. [17] During 1974, petitioner's master recordings were delivered directly to CBS by Invictus to fulfill, in part, Invictus' minimum delivery commitment under its contract with CBS. CBS was not advised that these master recordings were owned by petitioner. [18] Pursuant to the agreement between Invictus and CBS, CBS obtained copyright registration certificates in Invictus' name for the master recordings purchased by petitioner. Records pressed from each of petitioner's *20 master recordings were released in the marketplace in 1974. Petitioner did not know how long records manufactured from his master recordings remained in the marketplace. Petitioner never received reports of the number of records pressed, shipped, or sold from his master recordings. Under the terms of the agreement between Invictus and CBS, royalties from petitioner's master recordings were accrued to Invictus' account. The amounts so accrued were not necessarily paid to Invictus, as bookkeeping offsets were made for prior advances to Invictus and return of records previously distributed but unsold. Although, commencing in 1974, CBS credited Invictus with royalties earned on petitioner's master recordings, petitioner never received any of these royalties. None of the master recordings acquired by petitioner were successful in the marketplace. On his 1974 Federal income tax return, petitioner did not report as income the royalties used to purchase the master recordings. Nor did he report any income from the sale of records manufactured from his master recordings. He did, however, claim a depreciation deduction [19] based on a useful life of 9-1/2 years [20] of $30,000 for the master *21 recordings and an investment tax credit of $9,450. In July 1974, petitioner entered a songwriter/producer agreement with Motown which required some travel. On his 1974 "Songwriter/Producer" Schedule C, he claimed business expense deductions for authomotive expenses of $2,137 and travel and hotel expenses of $300. These expenses were ostensibly incurred in connection with petitioner's work under his 1974 agreement with Motown. On his "Songwriter/Producer" Schedule C, petitioner also deducted $29,453 representing his purported allocable share of losses of three partnerships: Multi-Vest Limited Dividend Housing Association (losses of $8,089); Second Avenue Limited Dividend Housing Association (losses of $4,516); and *22 Holland Stables (losses of $16,848). [21]
On the Schedule A attached to his 1974 return, petitioner claimed a deduction of $54,400 for alimony paid. A judgment of divorce was entered in October 24, 1974 terminating the marriage of petitioner and his former wife, Sharon Pierce Holland (Sharon Holland). The divorce judgment specifically provided that no alimony was to be awarded either party and attached to said judgment was a property settlement agreement dated September 3, 1974. Pursuant to this agreement, and in consideration of Sharon Holland's release of all claims by way of dower or otherwise, petitioner agreed to pay her $80,000. Said payment was specified by the parties to be a "fair, reasonable, and equitable division of marital property." In addition to the cash Payment, Sharon Holland received the marital home, all household goods, and an automobile. On his 1974 return, petitioner also claimed itemized deductions of $100 for charitable contributions and $750 for "tax preparation." All of the above deductions *23 and the investment credit were disallowed by respondent in the statutory notice of deficiency. OPINION The initial issue for determination is the tax consequence to petitioner of his purchase of master recordings in 1974. Focusing first on income, section 61(a)(6) specifically identifies royalties as one item of gross income. The fact that royalties owed petitioner were offset against the stated purchase price of the master recordings, rather than being paid directly to him, does not negate the fact that the royalties constitute income. Recognizing this, petitioner argues that the offset did not occur in 1974. We disagree. Petitioner and Holland were both vague as to the actual date of the offset, testifying that it occurred in 1975 or 1976. Their uncertainty and inaccuracy on this point is consistent with their total lack of involvement in the financial details of Holland's companies. In contrast, Tucker, the general financial manager of Invictus and the individual actually responsible for executing the offset, was specific in establishing the date of the offset as 1974. Tucker's certainty that the offset occurred in 1974 is further corroborated by the fact that his employment *24 by Holland's companies ended in 1974. Since the purchase occurred in January 1974 and the offset was accomplished during Trucker's tenure with Holland's companies, the offset must have occurred in 1974. We find that petitioner paid the full purchase price of $135,000 for the master recordings by an offset of royalties owed to him by Holland's companies. Consequently, he realized, and must recognize, $135,000 of additional income in that year. [22]
Having determined petitioner actually paid the full purchase price for the master recordings in 1974, the question remains whether he is entitled to any depreciation deduction or investment credit in that year. Petitioner's right to a depreciation deduction, as well as to the investment credit, is dependent on his showing that his master recordings activities constituted *25 a trade or business or were undertaken and carried on for the production of income. See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). [23] *26 To accomplish this, petitioner must demonstrate [24] that he engaged in his master recordings activities with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). The question is not whether the taxpayer's expectation of profit was reasonable, but whether he held an actual and honest profit objective. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979). While the parties agree that profit objective is the critical factor, they disagree as to petitioner's profit objective. Profit objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,supra at 34; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Respondent's regulations set forth nine relevant factors to be considered in determining whether an activity is engaged in for profit. Section 1.183-2(b), Income Tax Regs. In deciding whether the requisite profit objective exists in any case, the presence of one, or even a majority of these factors is not determinative. Benz v. Commissioner,63 T.C. 375 (1974); Golanty v. Commissioner,supra.In some cases none of these factors may be relevant. Also, greater weight must be *27 given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,supra.
Petitioner's and Holland's success as songwriters and producers is impressive as reflected by the industry recognition they enjoy and the awards they have received. Within the scope of their expertise we would accord their opinions great, if not controlling, weight in a proceeding in which they did not have the overriding personal interest in the outcome they have in the instant case. Although both testified with seeming conviction and candor, their desire throughout the proceeding was to obtain for petitioner the claimed depreciation deduction and investment credit. This motivation tempered, and in certain instances tainted, their testimony and jeopardized their credibility. Petitioner's self interest in the outcome is obvious. Holland's objectivity is also suspect due to his familial relationship to petitioner, his active role in the master recordings purchase as both advisor and seller (albeit through a wholly owned corporation) and the pendency before this Court of his own case dealing with claimed depreciation deductions *28 and investment credits relating to his purported master recordings purchases from his companies. [25] As noted above, objective evidence is to be accorded greater weight in considering the existence of the requisite profit objective. Siegel v. Commissioner,supra;Endahl v. Commissioner,supra. Based on the record evidence we hold that petitioner did not have the requisite profit objective. Even if we accepted petitioner' and his brother's testimony that purchase of the master recordings was motivated by petitioner's desire to increase his income, this desire does not mean that petitioner held "an actual and honest profit objective" when he purchased the master recordings. Petitioner could have increased his spendable income by increasing his deductions and this objective may have provided the motivation for his purchase. The objective facts do not support petitioner's contention that the requisite profit objective existed. His lack of concern with profit is repeatedly evidence by the manner in which he undertook the purchase of the master recordings and *29 dealt with his investment thereafter. At his brother's suggestion petitioner determined to purchase certain master recordings from his borther's companies. It was understood from the outset that the purchase would require no cash outlay by petitioner. Prior to making his purchase, petitioner did not discuss with anyone with actual experience in the commercial exploitation of master recordings, i.e., manufacturing or marketing records, the profit potential of an investment in master recordings, and there is nothing in this record to show that petitioner was capable of making this determination himself. Although at the time petitioner purchased the master recordings he contemplated that CBS would undertake their commercial exploitation, he made no effort to determine if recordings of the type he purchased or any recordings under the Invictus label were then being successfully exploited by CBS. Nothing in the record indicates the criteria, if any, petitioner used in selecting the specific master recordings he purchased. He did not solicit any input in the actual selection from Holland, Tucker, or anyone else. Petitioner made no inquiry into the specific sales volume or profitability *30 of other recordings by Laura Lee and Chairmen of the Board, despite the fact that certain of the Laura Lee master recordings he purchased were possible remakes of her prior releases. The lack of any profit objective is further evidenced by petitioner's selection of only one recording by Chairmen of the Board when at least two recordings are required for commercial exploitation. Petitioner failed to verify that the artists whose master recordings he acquired were under exclusive contract to Invictus, a factor critical to exploitation and potential profitability. In fact, petitioner was apparently unaware of Laura Lee's recording contract with Hot Wax which was not assigned to Invictus until after his purchase. He also was apparently unaware that certain royalties from sales of Laura Lee recordings would be paid by CBS to Buddha rather than to Invictus. He also seems to have been unaware of, or unconcerned with, the effect on potential profitability of his master recordings of CBS's right to offset advances and other items against royalties accrued to Invictus' account. Although petitioner asserts that he hired attorneys to represent him and help formalize his purchase, the record *31 is devoid of any evidence to support this assertion. The transaction documents were forms obtained by Tucker at Holland's request. Petitioner had no input in, and apparently did not understand some of the critical terms of, the documents he signed. There were no negotiations of purchase price, petitioner merely accepted the total price quoted by his brother. Petitioner did not bother to request verification that said price equaled cost or a break-out of the price for each of the nine master recordings. Petitioner's lack of profit objective is also apparent in the course of action, or lack thereof, adopted by petitioner after his master recordings purchase. Petitioner never took physical possession of his master recordings, never insured them, kept no books or records concerning this investment, never received any accounting or report of record sales and never received any royalties. Petitioner argues that under his "turnkey" arrangement, CBS and Invictus were obligated to handle his investment including maintaining books and records and making inquiries as to what was "happening to the records." CBS had no contractual relationship with petitioner and, therefore, had no such obligations. *32 Nor was Invictus so obligated. Petitioner also asserts he made inquiries of his brother as to how his recordings were doing. There is nothing in the record to indicate that Holland responded to these inquiries or followed up on them by providing petitioner with even an informal status report, either in 1974 or thereafter. While it may be industry practice to shift to others the task of actually exploiting master recordings as petitioner asserts, such practice does not explain petitioner's complete abandonment of concern or knowledge of an investment ostensibly made with a profit objective. Petitioner cannot seriously contend that his total lack of involvement or knowledge concerning a $135,000 investment indicates either a business-like manner of conducting this activity or a profit objective. On brief petitioner argues the existence of a number of the specific factors listed in section 1.183-2(b), Income Tax Regs. The "facts" and conclusory statements cited by petitioner in his arguments are not supported by, and in some instances directly contradict, the record. On the record before us, we find that petitioner failed to carry his burden of proving that he possessed the requisite *33 profit objective as to his master recordings activities. Consequently, we sustain respondent's disallowance of the depreciation deduction and investment credit claimed by petitioner. [26]
Petitioner has the burden of proving all elements for claimed deductions under section 162 for automobile expenses of $2,137, and travel and hotel expenses of $300. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). These expenses were purportedly paid in connection with petitioner's work under his 1974 contract with Motown.[27]Section 162 allows a deduction for all ordinary and necessary "traveling expenses * * * while away from home in the pursuit of a trade or business." However, section 274(d) requires a taxpayer to substantiate travel expenses, including lodging, by adequate records or sufficient evidence corroborating his own statements as to the amount, time, place and business purpose of the expenditures. Section 1.274-5(c), Income Tax Regs.; Sanford v. Commissioner,50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). *34 Any expense not adequately substantiated will be disallowed in full. Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 644-645 (1975); Sanford v. Commissioner,supra.Petitioner failed to provide the necessary substantiation. His oral testimony, which is vague and unsatisfactory, is simply not enough. Gilman v. Commissioner,72 T.C. 730 (1979). [28] We, therefore, sustain respondent's disallowance of these deductions.
On his Songwriter/Producer Schedule C, petitioner claimed a deduction of $29,453 representing his allocable share of partnership losses. The record is silent as to why these purported losses were claimed on petitioner's Songwriter/Producer Schedule C. A 1974 Schedule K-1 and other documents, *35 (e.g., December 4, 1972 prospectus and 1972 projections) for Multi-Vest Limited Dividend Housing Association and a Schedule K-1 for Second Avenue Limited Housing Association were received in evidence. These do not provide adequate proof that petitioner was a partner in these partnerships, that the partnerships generated deductible losses or that petitioner is entitled to the portion of purported losses claimed. As to the third partnership, Holland Stables, there is no evidence in the record indicating such a partnership ever existed. In fact, on brief, Holland Stables is characterized as a proprietorship and reference is made to travel and miscellaneous expenses as part of the $16,848 losses of this "partnership." On brief, petitioner summarily asserts that he sustained partnership losses and paid Holland Stable expenses in connection with his music business activities. Based on petitioner's failure to prove any entitlement, we sustain respondent's disallowance of the claimed "partnership" losses. Petitioner also bears the burden of proof as to his claimed alimony deduction. Welch v. Helvering,supra; Rule 142(a). Section 215 provides that "there shall be allowed as a deduction *36 amounts includible under section 71 in the gross income of his wife." Section 71(a)(1) provides, in pertinent part, that periodic payments made under a decree of divorce because of the marital or family relationship are includible in the wife's gross income. Payments in the nature of a property settlement are not includible in income under section 71 or deductible under section 215. Griffith v. Commissioner,749 F.2d 11 (6th Cir. 1984), affg. T.C. Memo. 1983-278; Benedict v. Commissioner,82 T.C. 573 (1984); Yoakum v. Commissioner,82 T.C. 128 (1984); Thompson v. Commissioner,50 T.C. 522 (1968). Petitioner argues that the claimed $54,400 deduction was paid pursuant to and as part of the divorce decree and that all cash payments plus the fair market value of the property transferred is alimony and is deductible. However, the judgment of divorce explicitly provides that there would be no alimony and that payments made by petitioner represented a division of marital property. Since petitioner failed to show he made any deductible alimony payments in 1974, we sustain respondent's disallowance of this claimed deduction. Finally, as to the claimed deductions for charitable contributions *37 and tax preparation return fees, we must again sustain respondent's disallowance. Petitioner stated he had made the claimed charitable contributions but provided no further details or evidence such as the identity of the recipient(s) or a cancelled check or receipt. In fact, on brief, petitioner's counsel was uncertain as to the amount of the contribution, at one point stating it was $300 and at another $100. As to the claimed tax preparation deduction, petitioner introduced a statement from the preparer to his attorney for a fee of $750 as a "Retainer for the preparation of the 1973 individual federal, state and city tax returns" of petitioner. However, he failed to introduce any evidence, other than his testimony, that said fee was paid. Again, petitioner failed to carry his burden of proof and we sustain respondent's disallowance of the charitable contributions and tax preparation deductions. Based on the foregoing, Decision will be entered under Rule 155.
Footnotes
1. After trial, a supplementary stipulation as to deductions for legal fees, taxes, and interest was entered by the parties. ↩
2. This issue was raised in a post-trial Amendment to Answer. The Amendment was filed pursuant to the Court's grant of respondent's Motion for Leave to Amend Answer to Conform to the Evidence. 3. Respondent also disallowed investment credit carrybacks to 1972 and 1973 and denied petitioner's claims for refund as to those years.The carrybacks are contingent on allowance of petitioner's claimed 1974 investment credit. ↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
5. As a result of respondent's adjustments, the Notice of Deficiency also includes an assessment of additional self-employment tax and recomputes petitioner's tax liability based on the use of a standard deduction.
6. The commercial success of a record is dependent on the artist, song, arrangement, and "taste" of the public at a given point in time. There is never a guarantee that any record, no matter how high the quality, will be profitable. Other factors also impact on the profitability of a given selection. For example, if the "A" side of a record is successful, the "B" side may be relatively unimportant. Also, potential profitability may be dependent on appeal in foreign as well as domestic markets and potential inclusion on an "oldies" or similar album.↩
7. A master recording is any original recording used in the manufacture of phonograph records.↩
8. Two selections are required to manufacture a "pop single." Petitioner purchased master recordings for four singles and one selection by Chairmen of the Board which was included on an album release. ↩
9. A different recording of this song by Laura Lee was released on the Hot Wax Label prior to 1974. ↩
10. This song had been recorded by Brian Holland and released on the Invictus label in 1972. Petitioner's release was "mildly successful." ↩
11. A different recording by Laura Lee may have been released on the Hot Wax label prior to 1974. ↩
12. These master recordings were not fully produced by Stagecoach or HDH Productions. Rather, these artists' manager came to Holland with "demo tapes" which were remixed and reedited to produce new master recordings. ↩
13. See infra↩ n. 16 regarding the questionable status of Laura Lee's contractual relationship with Invictus.
14. Even had petitioner attempted such a projection, the fact that there was no specified purchase price for the individual master recordings and that petitioner's proceeds were subject to offsets for Invictus liabilities, among other factors, would have made such a projection meaningless.↩
15. These notes were payable on demand, in January 1979 and in January 1980, respectively.↩
16. At the time this contract was entered Laura Lee recordings were released under the Hot Wax label and distributed by Buddha Records, Inc. (Buddha), a company unrelated to any Holland company. As was common in the industry, Laura Lee had an exclusive recording contract with Hot Wax. CBS expressed strong interest in obtaining the right to distribute Laura Lee recordings and, in May 1974, an arrangement was made whereby Hot Wax assigned its exclusive artist contract with Laura Lee to Invictus. Thereafter, Laura Lee's recordings were pressed and marketed by CBS. CBS agreed to pay the royalties from certain Laura Lee recordings to Buddha as opposed to Invictus. Petitioner apparently was unaware of Laura Lee's exclusive recording contract with Hot Wax when he acquired his Laura Lee master recordings. 17. These percentages are in relation to amounts due Invictus under its agreement with CBS, not gross sales proceeds. ↩
18. The reason for the lack of notification to CBS may have been the provision in the agreement between Invictus and CBS whereby Invictus warranted that each master utilized by CBS in pressing records under the agreement would be "the sole property of Invictus."↩
19. The depreciation deduction included $2,000 of additional first-year depreciation and was computed on a modified half-year convention. ↩
20. While master recordings physically exist for a period in excess of 9-1/2 years, they may be commercially viable for a significantly shorter period. As a rule of thumb, 50 percent of the income is earned within 3 years of a record's release. Prior record releases by Laura Lee and Chairmen of the Board were not marketed for 9-1/2 years.↩
21. Nothing in the record indicates that Holland Stables existed or was a partnership and, on brief, this activity is, for the first time, referred to as a proprietorship.↩
22. There is no evidence in the record to support respondent's argument that, since petitioner was never paid the royalties in full, the royalties used to offset the purchase price were not representative of the fair maket value of the master recordings. Nor is there any evidence to support respondent's assertion that Holland's companies were financially strained in 1974.↩
23. Section 183 allows deductions to the extent of gross income with respect to an activity not engaged in for profit. Brannen v. Commissioner,78 T.C. 471, 499-500 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984). As petitioner reported no income in 1974 from his master recordings activity, he is entitled to no deduction under this provision.
24. The characterization of petitioner's master recordings activity as a trade or business, and implicitly the profit objective of said activity, was challenged in the notice of deficiency and addressed in the petition. Petitioner, therefore, bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering,290 U.S. 111↩ (1933).
25. In deciding this case we have given no weight to Holland's proceeding (docket No. 24725-82) or the record in that proceeding.↩
26. Based on our holding, we need not address respondent's alternative and additional arguments concerning petitioner's entitlement to the depreciation deduction and investment credit.↩
27. The record does not indicate if Motown paid or reimbursed petitioner for any of these expenses or whether petitioner was entitled to reimbursement. ↩
28. Although sec. 1.274-5(c)(2)(ii)(b), Income Tax Regs.↩, provides relief from the requirement of written substantiation of business purpose where that purpose is "evident from the surrounding facts and circumstances," the lack of evidence as to such facts and circumstances in this case makes this exception inapplicable.