MARVIN A. BASS and ELAINE T. BASS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bass v. Commissioner
Docket No. 16963-83.
United States Tax Court
T.C. Memo 1988-61; 1988 Tax Ct. Memo LEXIS 61; 55 T.C.M. (CCH) 126; T.C.M. (RIA) 88061; February 22, 1988. Barry I. Fredericks and David M. Brandes, for the petitioners. Patricia A. Donahue and Nancy M. Vinocur, for the respondents. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By a notice of deficiency mailed March 31, 1983, respondent determined a deficiency *63 in petitioners' 1979 Federal income tax in the amount of $ 11,499.30. The issues for decision are (1) whether petitioners are entitled to depreciation and advertising expenses deductions for their distributive share of loss taken with respect to their investment in Darmaj Company, a partnership formed to purchase and commercially exploit the film, "Safari Express," (2) whether petitioners are liable for an addition to tax under section 6621(c), and (3) whether damages should be awarded to the United States and against petitioners under section 6673. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of filing the petition, Marvin A. and Elaine T. *64 Bass resided in Great Neck, New York. Petitioners jointly filed Federal income tax returns for the taxable year 1979, using the cash basis method of accounting. [2]
Sometime during 1979, one of petitioner's clients, Daniel Sandberg (Sandberg), learned that "Safari Express" (sometimes referred to as the film) was available for purchase. Sandberg, who processed motion pictures at TVC Laboratories, was contacted by a colleague, Barry Lieberman (Lieberman), an independent film distributor. Lieberman was representing IBC Distribution Company (IBC), the purported owner of the film. Sandberg viewed the film and decided that it would be a profitable investment. He contacted petitioner, his attorney of several years, who had previously expressed an interest in investing in a film. Sandberg and petitioner invited a third acquaintance, Charles Tolep (Tolep) to view the film. [3]Tolep was the vice president and general manager of Viacom, a company which produced television feature programs and cable entertainment *65 programs. [4] Tolep also believed the film would be a good investment. Thereafter, Sandberg, Tolep and petitioner decided to commence negotiations for the purchase of the film. "Safari Express" is a comical action adventure film shot in Central Africa. The director, Duccio Tessari, and the producer, Vittorio Galiano, are both Italian, as is the leading actor, Giuliano Gemma (Gemma). Gemma plays a tour guide in Africa who, along with Biba, the Wonder Chimp, meets and befriends Ursula Andress (Andress) who is suffering from amnesia. The villain, played by Jack Palance (Palance), is attempting to sell guns to rival African tribal factions to cause a war. By inciting a tribal war Palance hopes to secure control over some uranium mines. There is fighting among the African tribesmen *66 and some tribesmen attack Gemma and Andress. Gemma and Andress are rescued by Biba, [5] and Andress subsequently regains her memory. [6] Together Gemma and Andress stop the truckload of weapons that Palance has shipped to the warring tribesmen. Gemma and Andress are recaptured by the Africans and are again rescued by Biba. Palance dies in a plane crash. The tribal war was narrowly averted. Because the original soundtrack was partially in Italian many of the voices had to be dubbed into English. The voices of Andress and Palance, although originally in English, had to be synchronized for the film's American distribution. In December of 1979, petitioner formed a partnership, Darmaj Company (Darmaj), for the *67 purpose of purchasing the film. [7] The other individuals invited to join Darmaj were Daniel Sandberg, Martin Karlin, Arthur Meisnere and June Jones. Martin Karlin was petitioner's brother-in-law at the time of trial. Karlin made his investment in the film on the basis of petitioner's advice. The partners never met together, and there were no offering materials prepared. The partners made partnership subscription payments in the following amounts: Name
Payment By 12/28/79
Payment By 5/15/80
Sandberg
$ 22,500
$ 18,700
Meisnere
5,000
4,400
Karlin
15,000
12,650
Bass
7,500
6,600
Jones
10,000
8,250
Tolep
5,000
4,400
TOTAL
$ 65,000
$ 55,000
*68 Prior to purchasing the film the partners did not research the profitability of the film or the soundness of their investment in it. They did not acquire an appraisal or an income projection from an expert. They did not seek advice from someone more knowledgeable and experienced than themselves. Only Tolep was skilled at evaluating the theatrical opportunities of motion pictures. Sandberg's work was in production. They never insured the film. [8]
At the time of the initial contact, petitioner believed that IBC, represented by Lieberman and his associate, Don Marino (Marino), was the owner of the film, but the Darmaj partners failed to investigate the chain of title. Marino and Lieberman were the only shareholders in IBC. IBC purported to be in the business of distributing films but never distributed a film before or after "Safari Express." The only distribution activity ever conducted by IBC prior to the *69 engagement by Darmaj was an earlier distribution of a record album. Despite the fact that "Safari Express" was produced in 1976, the Darmaj partners failed to establish the history of the film prior to purchase nor did they research the producer. The Darmaj partners neither knew or inquired about IBC's history and experience. Similarly IBC did not ask about the financial strength of the Darmaj partners. There was evidence that petitioner was told the amount of production costs, at some time either before or after the purchase of the film. The Darmaj partners and Lieberman agreed on a total purchase price of $ 1,200,000, to be paid in two installments. The down payment, in the amount of $ 100,000, included a cash payment of $ 55,000 and a promissory note in the amount of $ 45,000 payable on or before June 1, 1980. The bulk of the purchase price was represented by a promissory note in the amount of $ 1,100,000 payable on or before December 31, 1989, carrying an interest charge at 6 percent per annum. Throughout the term of the note, 80 percent of all distribution proceeds were to be paid to IBC, while the partnership would retain 20 percent. In the event that distribution proceeds *70 were insufficient to equal the payments due, the payments would be deferred to the end of the note term. Lieberman, the purported holder of the note, was unable to produce it upon respondent's request. Darmaj acquired the film on December 27, 1979. On that same day Lieberman, representing IBC, purchased the film from Amerinda Establishment (Amerinda) for $ 60,000. Amerinda retained a security interest in the film, securing a promissory note signed by IBC in the amount of $ 25,000 and payable on June 6, 1980. [9]
In a modification of the Acquisition Agreement dated December 27, 1979, Darmaj and IBC agreed that upon the occurrence of certain events terms for payment of the promissory note would change. If, during the first four years of the contract term, Darmaj failed to pay principal and/or interest in the amount of $ 500,000, the right to distribute the film in the video cassette and video disc markets would revert to IBC. [10] If, in the three years following such a reversion, IBC earned revenue *71 from the video cassette distribution in the amount of $ 50,000 and 4,000,000 video cassette and/or video disc players were sold in the United States the note would become nonrecourse. The parties agreed that at the time of trial at least 4,000,000 video cassette and video disc recorders had been sold in the United States. Once the note had become nonrecourse, the source of payment to IBC would be restricted to proceeds from the film's distribution. Pursuant to the acquisition agreement, Darmaj retained the distributor already engaged by IBC. Sometime prior to the sale to Darmaj, IBC had arranged for Joseph Green (Green) of Joseph Green Film Enterprises, Inc., to distribute the film theatrically in the United States and English-speaking Canada [11] for a term of 10 years. Green had been an independent distributor for approximately 10 years and had distributed a few reasonably successful films. The partners did not object to IBC's requirement that Green be *72 hired nor did they investigate alternative distribution companies. The Distribution Agreement, assumed by Darmaj, provided that Green would retain 50 percent of all proceeds after subtracting costs. Costs included advertising and promotional expenses, release and trailer prints, shipping expenses, and the costs of special mailings. Green received an advance payment in the amount of $ 10,000 in December of 1979 for the distribution effort. The Distribution Agreement called for 20 United States play dates by December 31, 1980, [12] with at least one play date occurring before December 31, 1979. *73 "Safari Express" did not have 20 play dates. In fact there was only one play date in the United States, [13] a showing at the Thalia Theatre in New York City on December 29, 1979, at midnight. There were only three tickets sold and the viewing generated receipts in the amount of $ 9.00. The play date was arranged under a "four wall" contract which required Green to pay rent in the amount of $ 150 for the fully staffed theatre. The theatre owner received no part of the proceeds from ticket sales but kept all of the concession receipts. A more typical distribution contact calls for a division of the proceeds between the distributor and the theatre owner. Four wall contracts are generally employed only when the theatre owner fears that the film will not generate enough in proceeds to cover his expenses. Green paid the advertising expenses and sustained a net loss of $ 139.75. There were no subsequent theatrical play dates in the United States. *74 On March 5, 1981, "Safari Express" was licensed to Home Box Office cable television company (HBO) for a payment of $ 10,000. [14] Prior to purchasing the film, HBO required Green to obtain a copyright on the film. Although the film had been in commercial distribution for approximately 15 months, neither the owners nor the distributor had secured copyright protection. After expenses incurred in readying the film for HBO, Darmaj received net revenue in the amount of $ 2,383.60. Of this amount, 80 percent, in the amount of $ 1,906.88, was paid to IBC pursuant to the Acquisition Agreement. Darmaj partners retained only $ 476.72. During June of 1981, HBO scheduled "Safari Express" to play 8 times. [15]
On February 10, 1982 respondent commenced an audit of Darmaj. Little more than a month later, Darmaj released Green as the distributor of the film. On December 10, 1982, Green was rehired. [16] During the period between March and *75 December the film had no distributor. Darmaj licensed the film to Media Home Entertainment (Media) for sale and rental on video cassettes. The agreement, executed on October 15, 1982, allocated 15 percent of gross rental revenue and 15 percent of wholesale proceeds to Darmaj for a term of 7 years. If this arrangement failed to produce royalty income in the amount of $ 2,000 for Darmaj over the first 4 years of the contract, Media promised to pay Darmaj an advance in the amount of $ 2,000. As of the time of trial, the advance had not been paid, and Media has not exercised its rights to produce video cassettes of "Safari Express." Robert Norton (Norton), the Director of Business Affairs for Media noted that Media had not produced video cassettes of "Safari Express" because they were more interested in the "bigger and better" films they *76 had in inventory. Norton explained that Media had decided against distributing "Safari Express" on video cassettes and wanted to sell it. As of the date of trial Media had not yet found a buyer. Petitioner was the most actively involved of all the partners although the partnership did not have a managing partner per se. The other partners appear to have been significantly less concerned about Darmaj activities. Two of the partners, Tolep and Karlin, professed to be unaware of the promissory note signed by the partnership for $ 1,100,000, although the note was specifically mentioned and authorized in the Partnership Agreement. None of the partners ever received or requested an accounting of partnership financial activity or any other information. [17] None of the partners ever received a partnership distribution nor had any protested the partnership's failure to make distributions. None of the partners recouped his or her investment. OPINION The first issue for our decision is whether respondent properly disallowed petitioner's *77 deduction of his distributive share of the partnership losses. The partnership's losses were comprised of depreciation deductions in the amount of $ 300,000 and advertising expenses in the amount of $ 10,000. Resolution of this issue depends on whether petitioner entered into the activity with the actual and honest objective of making a profit. In order to take deductions for depreciation and advertising, with respect to an asset, the asset must be used in a trade or business or held for the production of income, within the meaning of section 167(a). Because there was no evidence to suggest that the partners' activity with respect to the film constituted a trade or business, the inquiry is whether the partners' activity with respect to the film was investment activity. Higgins v. Commissioner,312 U.S. 212 (1941). In order to establish investment activity, petitioners must prove that the film was held for the production of income. Beck v. Commissioner,85 T.C. 557 (1985). *78 Whether Darmaj engaged in its activities for profit depends on whether the activity was undertaken with an "actual and honest objective" of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one but the taxpayer must have entered into, or continued, the activity with the objective of making a profit. Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Transactions which serve no "purpose, substance or utility apart from their anticipated tax consequences" are disregarded for tax purposes. Knetsch v. Commissioner,364 U.S. 361 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), *79 affg. 78 T.C. 471 (1982). The question of whether a profit motive exists is to be resolved on the basis of all the attenuating facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. Although section 183 is actually an allowance provision, not a disallowance provision, respondent's regulations promulgated under that section have historically been employed to facilitate the determination of the existence of a profit motive. Respondent's regulations set forth 9 relevant factors. Sec. 1.183-2(b), Income Tax Regs.[18] No one factor is controlling. Golanty v. Commissioner, supra at 425-426. In this analysis greater weight is accorded to proven objective facts than to mere statements of intent. Beck v. Commissioner, supra at 570; Siegel v. Commissioner,78 T.C. 659, 699 (1982). *80 Respondent disallowed the partnership's losses on the grounds that the partnership was neither organized nor operated with the intention of making a profit. Respondent argues that the entire transaction constituted an "abusive tax shelter." Petitioner counters that the primary goal of the partnership was to produce income from the commercial exploitation of the film and that therefore all losses taken by the partners were properly taken. Petitioner bears the burden of proving that he had a profit motive. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). For the reasons discussed below and based on our consideration of all the facts and circumstances, we conclude that the activity of the partnership, Darmaj, was not engaged in with the intent to make a profit. Therefore the partnership was not entitled to depreciate the film or to deduct advertising expenses and petitioner was not entitled to deduct his distributive losses as a partner. The partners of Darmaj, and most specifically petitioner, failed to conduct the affairs of the partnership in a businesslike *81 manner. The partnership did not circulate promotional or offering materials. There were no meetings of all the partners. There were no informational mailings or reports sent to partners who were not involved with the day-to-day activities of the partnership. The papers necessary to form the partnership were executed in a haphazard manner, indicating that the formation of the partnership was considered little more than a formality. Furthermore, there was considerable evidence that some of these documents had actually been signed on dates different from those which they bore in order to create the impression that the entire transaction commenced and concluded in 1979. None of the partners, except Tolep, were experienced or knowledgeable in the commercial distribution of motion pictures. Sandberg's experience was with production. However, the partners did not seek the advice of an disinterested expert. Tolep's work concerned the commercial potential of motion pictures and he should have been able to predict the film's reception with the critics and the public. However, Tolep was subject to a deficiency for the same issues as concern us in the instant case and his case is bound *82 by the outcome in this case. We found Tolep's statements that he believed that the film would become a commercial success unworthy of our belief and tainted by personal bias. The absence of pre-acquisition research is indicative of a lack of profit motive. Surloff v. Commissioner,81 T.C. 210, 237 (1983). The purchase of "Safari Express" was marked by haste and carelessness. The partners did not investigate the production history of the film. The film, produced in 1976, had been available for distribution for the three years preceding the date of purchase by Darmaj but the partners did not inquire into the film's history during that period. The partners failed to investigate IBC, a corporation which had no experience with the commercial exploitation of motion pictures before distributing "Safari Express." Since the distribution of "Safari Express," IBC has not engaged in any activity at all which suggests that it was never more than a mere shell corporation. The partners failed to obtain income projection evaluations or appraisals. There was no evidence that the parties *83 negotiated the purchase price at arm's length. The partnership never insured the film. Finally, the film did not have copyright protection until HBO required the partnership to obtain it, as an incident to sale, although the film had already been released publicly. The film was purchased by IBC on the same day that IBC sold it to Darmaj. Either the partners failed to establish that IBC actually owned the film at the time it was sold or the partners knew that IBC would purchase, or had purchased, the film that day. This could be interpreted as extreme carelessness or, alternatively, as an indication that the partners were using IBC as a middleman to purchase the film at a higher price. At trial, petitioner, Tolep and Sandberg created the impression that they were sharp and careful businessmen. There was no evidence that they could have been so careless as to neglect to establish the chain of title. The subsequent distribution history of the film after being acquired further demonstrates the partnership's lack of profit motive. The film was under contract for distribution to Green, who had limited experience. There was no evidence to suggest that the partners objected to *84 being forced to assume the service contractor that they attempted to substitute an alternative distribution company. Although Green's distribution efforts proved to be futile almost immediately, the partners did not express concern until the spring of 1982, more than two years after the initial release, but only a month after respondent commenced an audit. Petitioner maintains that the partnership fired Green at this time because he was unsuccessful and that he was rehired only when he promised to do better. However, there was no evidence indicating that Green promised to improve his performance. If the firing were truly a result of the firm's poor performance Green would not have been rehired at a later date, after the audit was completed. We find that Green was fired in order to make a showing of profit-oriented activity at the time of the audit for the exclusive benefit of respondent's audit agent. Although the film was licensed to Media for video cassette exploitation, the partnership did not protest Media's failure to release the film on video cassette. The partnership did not attempt to persuade Media to release the licensed rights, allowing the partnership to distribute *85 the film on video cassette. In any case, under the terms of the purchase agreement IBC had a reversionary interest in the rights to distribute the film on video cassette or video discs. The partnership blatantly ignored this provision. We have held that a grossly inflated purchase price indicates the absence of a profit motive. Flowers v. Commissioner,80 T.C. 914 (1983); Brannen v. Commissioner, supra at 508. The fair market value of the film at the time of purchase was far less than the state purchase price of $ 1,200,000. Respondent introduced two expert witnesses to testify to the value of the film at the time of purchase. Petitioner did not put on any expert testimony although several of petitioners's witnesses were skilled and experienced in the production and distribution of motion pictures. None of petitioner's witnesses spoke directly to the question of value. Robert M. Newgard (Newgard) testified for respondent as to the value of the television distribution rights to "Safari Express" as of December 27, 1979. At the time of trial, Newgard was a consultant *86 for domestic and international clients who were interested in acquiring and marketing television programs. Before that he was vice president for Worldwide Sales for Avco Embassy Pictures and also for Paramount TV. Newgard has testified frequently for respondent. In his evaluation report, dated October 31, 1985, Newgard determined that "Safari Express" was a "fairly cute comedic picture" but that the dubbing was poor. [19] He decided that "Safari Express" would not be attractive to television networks as a prime time or late night movie. He believed that it could be packaged for syndication, however, with a potential gross of $ 75,000 for the first 5 to 7 years. Newgard estimated the cable television rights to be worth $ 10,000 or $ 15,000. Finally, he noted that there would be potential revenue in the amount of $ 25,000 from all ancillary markets combined. [20] In conclusion, Newgard determined that "Safari Express" had a fair market value, with respect to television rights only, of $ 10,000, net of distribution expenses. *87 Respondent also submitted a report prepared by William A. Madden (Madden) an expert on the theatrical market for motion pictures. Madden was corporate vice president and general sales manager at Metro-Goldwyn-Mayer until 1975 and then senior vice president for world wide sales at Doty-Dayton. Madden has also performed consulting work and has been an instructor in film at the University of California, Los Angeles, since 1979. He is a member of the Academy of Motion Picture Arts and Sciences, the Motion Picture Associates Foundation and the Foundation of Motion Picture Pioneers. Madden has frequently testified for respondent concerning the valuation of motion pictures. Madden characterized the film as a "slap-stick comedy" which is "contrived, corny and fails to hold your interest." He found the actors' performances "just average" and criticized the dubbing. He stated that "the talents of Ursula Andress and Jack Palance are wasted in this film." Madden further noted that "Safari Express" was one of numerous low-budget motion pictures to be produced in Italy in the mid-1970's. Only a few of these motion pictures ever became successful in theatres in the United States. Madden *88 determined that "Safari Express" had no theatrical value and could only be distributed under four wall contracts. Both Madden and Newgard have testified before us on many occasions and we have always found their opinions to be well reasoned and well supported. Their professional credentials and long years of experience engender confidence in their ability to evaluate a film's chances of commercial success. Furthermore, when we viewed the film we found it to be as described by Madden and Newgard. In juxtaposition to the testimony of these seasoned experts petitioner introduced Tolep's testimony. Tolep, who was not qualified as an expert, is far from disinterested because his own case is bound by the outcome in this case. Thus, under these circumstances we endorse the evaluation reports submitted by respondent's two expert witnesses as more reasonable and accurate. The evidence is conflicting with respect to the exact figure constituting the film's fair market value at the time of purchase. It is apparent, however, that the film was worth far less than $ 1,200,000. Newgard valued the television rights to "Safari Express" in the amount of $ 10,000. Madden stated that the *89 film had no theatrical value at all. IBC bought it for only $ 60,000 on the day it was purchased by Darmaj. The best approximation of fair market value is a figure which results from bona fide arm's-length negotiations. Abramson v. Commissioner,86 T.C. 360, 372 (1986). In the instant case, however, there was no evidence that the $ 60,000 figure paid by IBC to Amerinda was the fruit of such negotiations. Furthermore, petitioner did not contend that the figure of $ 60,000 represented the fair market value of the film at the time of purchase. In the absence of evidence to the contrary, we conclude that the fair market value of "Safari Express" at the time of purchase was $ 10,000. Finally, the terms of the promissory note effectively insulated the partnership from earning any profits. The note provided that the partnership would only receive 50 percent of net proceeds, after distribution expenses. The holder of the note, IBC, was entitled to 80 percent of the proceeds received by the partnership as a payment combining interest and principal. Thus, the partnership could *90 never retain more than 20 percent of 50 percent of net proceeds. The film would have had to generate income in an amount greater than $ 2,750,000, above and beyond distribution expenses in order to pay the principal due on the note. According to the expert witnesses the likelihood of this occurring was virtually impossible. Furthermore, Madden indicated that the film could only be released under four wall contracts so the distribution expenses could be expected to be very high. It would be extraordinary for the theatrical distribution of "Safari Express" to generate this much revenue. The Darmaj partners were sophisticated and experienced businessmen. It strains credulity to imagine that they believed that "Safari Express" would surpass even the most optimistic expectations. Rather we find that they believed "Safari Express" would only generate revenue from television distribution and in far more modest amounts than the purchase price would indicate. Another manifestation of a tax avoidance motive underlying the entire "Safari Express" arrangement is the absence of true indebtedness. The promissory note signed by the Darmaj partners purported to document a debt of $ 1,100,000, *91 but there was evidence that the partners did not intend to make payments on the note. The terms of the note required that repayments be made only from net distribution proceeds. The note was allegedly due in 1989 but this term was extended to 1992. However, two of the partners did not remember that the note existed and one partner, Karlin, stated that he was not liable for repayment. This suggests that despite the appearance of true debt the note was never intended to be enforced. Furthermore, the holder of the note, Lieberman, could not even find it to produce at trial. The circumstances surrounding the alleged promissory note were suspicious and petitioner has introduced no evidence to allay the resulting doubts. Thus, based on the evidence presented and the demeanor of the witnesses at trial, we conclude that Darmaj never really intended to be liable for repayment. Based on the foregoing, we conclude that the partnership's purchase of the film, "Safari Express," was not an activity entered into for profit. Therefore, the deductions for depreciation and advertising were improper and petitioner may not deduct his distributive share of the losses. Because we resolve this *92 issue on these grounds we will not address respondent's alternative arguments. [21]
The second issue for our consideration is whether petitioner is liable for the additional interest on substantial underpayments of tax attributable to tax motivated transactions pursuant to section 6621(c). Section 6621(c) applies to interest accruing after December 31, 1984, even when the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowielczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 *93 with respect to a substantial underpayment attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Section 6621(c)(3)(A) enumerates the types of transactions which are to be considered tax motivated transactions. These include "(i) any valuation overstatement (within the meaning of section 6059(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). Under regulations issued by respondent pursuant to the express authority of section 6621(c)(3)(B), the definition of tax motivated transaction also includes any deductions disallowed for any period under section 183. Sec. 301.6621-2T, Q and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). We held above that Darmaj's activity with respect to the film "Safari Express" was arranged to generate tax benefits and was not entered *94 into for profit. Therefore, the entire loss claimed by petitioner with respect to the partnership's activity was attributable to a tax motivated transaction. See Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). The third and final issue for our consideration is respondent's request that we award damages to the United States and against petitioner pursuant to section 6673. Section 6673 provides: Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay, that the taxpayer's position is frivolous or groundless, * * * damages in an amount not in excess of $ 5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax.
The statute clearly requires that in order to award damages we must find that the taxpayer has instituted or maintained this proceeding primarily for delay or that petitioner's *95 position was frivolous or groundless. After reviewing the record carefully, we have concluded that petitioner's position here was not so lacking in merit as to constitute a frivolous or groundless position. We find no basis for the conclusion that this case was instituted primarily for delay. Accordingly, we decline to award damages under section 6673. In sum, after carefully considering all the evidence presented in this case and the arguments made by both parties, we conclude that petitioner has failed to meet his burden of proving that the investment in Darmaj was entered into for profit. We hold that petitioner's loss, representing his distributive share in the partnership losses, was improperly taken. Furthermore, we have determined that any substantial underpayments in tax which result from this disallowance were attributable to a tax motivated transaction and thus are properly subject to the additional interest under section 6621(c). Decision will be entered for the respondent.
Footnotes
1. Unless other indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Former subsection (d) of section 6621↩ was redesignated as subsection (c) and amended by section 1511(c)(1)(A)-(C), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. 2. Elaine T. Bass is a party to this action solely by filing a joint return with her husband, Marvin A. Bass. All references to petitioner, singularly, are to Marvin A. Bass. ↩
3. Tolep's ultimate investment in Darmaj Company became the grounds for a deficiency by respondent. Tolep has agreed that the outcome of his case, docket No. 7387-84, will be bound by the outcome in the instant case. ↩
4. Although Tolep could have assisted in the commercial exploitation of the film through his own company he believed that it would have violated professional standards to do so. ↩
5. Biba played a major role in the film. For example, Biba dropped coconuts on the heads of Palance's thugs to rescue Gemma and Andress. Later in the film the chimp called for help on a short wave radio. Biba also witnesses an attempted murder, brings assistance to the victim, drives a jeep and sabotages an airplane. ↩
6. Andress recovered her memory by taking "medicine" prescribed by a doctor. The "medicine" was scotch whiskey, some of which was consumed by Biba. ↩
7. There was conflicting evidence with respect to the date when the partnership materials were actually completed. One copy of the partnership agreement bears June 13, 1979, as the date of partnership formation, while another copy bears the date of December 3, 1979. The Business Certificate for the Partners of Darmaj Company is dated December 29, 1979. The Certificate was notarized and bore the notation that all the partners were present on December 29, 1979. However, the Certificate could not have been signed until after January 7, 1980, the date on which it was mailed to Arthur Meisnere to sign. However, both the Partnership Agreement and the Business Certificate had been signed by all the partners by March 5, 1980. ↩
8. There was evidence presented to indicate that the partnership failed to secure a rating from the Motion Picture Associates of America which would be necessary for successful release. However, the evidence presented falls slightly short of supporting such a finding. ↩
9. IBC made the final payment on the $ 25,000 note, executed when purchasing the film from Amerinda Establishment, with the proceeds from the Darmaj note in the amount of $ 45,000. ↩
10. By a letter to IBC from petitioner dated December 10, 1982, the four-year term was extended so that IBC's reversionary rights to exploit the film on video cassette and video disc would not ripen until July 1, 1992. ↩
11. The geographical areas covered by the Distribution Agreement included all territories and possessions of both Canada and the United States, excluding Puerto Rico and Quebec, and Canadian and American ships and airplanes, military bases and quasi-governmental outposts. ↩
12. A play date is a leasing period, made up of either days or weeks. A popular film distributed by a major distribution company will usually be guaranteed 1,000 play dates in the first year of release. On the other end of the spectrum, a less popular film, distributed by an independent distributor, is usually guaranteed only 250 play dates in the first year of release. ↩
13. There were four play dates outside of the United States, in Nassau, the Bahamas and the Grand Cayman Islands. Although receipts were generated from these four play dates none of the proceeds had been received by the Darmaj partners by the time of trial. ↩
14. Green actually received gross revenue in the amount of $ 9,900 because $ 100 was deducted to cover the cost of attaching the copyright notice to the film. ↩
15. The dates were June 3, June 7, June 11, June 13, June 16, June 19, June 22 and June 28. ↩
16. Petitioner characterized this episode as a cancellation of the distribution contract followed by a rescission of the cancellation. Therefore, Green was the distributor continuously. In a letter dated March 15, 1982, petitioner indicated that Green's failure to profitably distribute the film was the reason for terminating their agreement. ↩
17. The partners did receive copies of Darmaj's Form K-1 which were prepared to assist the partners in computing their own Federal income tax. ↩
18. These factors are: (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. ↩
19. Newgard stated that the English speaking actors sounded like they had rubber lips. ↩
20. The ancillary markets considered were airlines, mining camps, tuna boats, armed forces radio and television, and home video. ↩
21. This case was tried and briefed by the parties in terms of a profit objective under section 183. Accordingly, our analysis is based upon that approach. But see Rose v. Commissioner,88 T.C. 386↩ (1987), which adopts a test of economic substance as to "generic" tax shelters.