DAN and MIRIAM AILLONI-CHARAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ailloni-Charas v. Commissioner
Docket Nos. 6167-84, 39343-84.[1]
United States Tax Court
T.C. Memo 1988-83; 1988 Tax Ct. Memo LEXIS 111; 55 T.C.M. (CCH) 252; T.C.M. (RIA) 88083; February 29, 1988. Dan Ailloni-Charas, pro se. Dennis Bresnan, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By separate notices of deficiency dated January 13, 1984 and October 15, 1984, respondent determined deficiencies in petitioners' Federal income taxes as follows: Taxable Year
Amount of Deficiency
1975
$ 9,869
1976
1,823  1977
363    1978
1,030  The issues for decision are (1) whether petitioners are entitled to an investment tax credit and deductions for depreciation and expenses *113 for their distributive share of loss taken with respect to their investment in Sci-Fi Pictures Company, a partnership formed to purchase and commercially exploit the film "Solaris," and (2) whether, with respect to taxable years 1975 and 1976, petitioners are liable for additional interest under section 6621(c). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. The only testimony at trial was expert opinion testimony. Petitioners Dan and Miriam Ailloni-Charas resided in Rye Brook, New York, at the time of filing the joint petition. Petitioners used the cash basis method of accounting. Miriam Ailloni-Charas is a petitioner solely by filing a joint return *114 with her husband, Dan Ailloni-Charas. All references to petitioner, singularly, will be to Dan Ailloni-Charas. During the years in issue, petitioner was the president of Stratmar Research Corporation (Stratmar), a marketing consulting business. Petitioner hold a Ph.D. in management science from the Graduate School of Business at New York University. Petitioner first learned about the partnership, Sci-Fi Pictures Company (Sci-Fi), from his accountants, the firm of Auerbach, Buck and Company (Auerbach, Buck). He had never before invested in a motion picture, nor has he done so since making the investment in Sci-Fi. Petitioner received a "Confidential Internal Memorandum" (the memorandum) prepared and circulated by Sci-Fi to solicit and advise prospective limited partners. The memorandum advised that Sci-Fi, a partnership organized and operated under New York law, was formed for the purpose of acquiring and commercially exploiting a motion picture film called "Solaris" (hereinafter sometimes referred to as the film). The memorandum stated that limited partnership interests would be available for subscription payments in the amount of $ 57,500 per interest, with at least 25 *115 percent due simultaneously with the execution of the Partnership Agreement (the Agreement). The partnership sought total capital contributions in the amount of $ 1,855,000. [3] The general partner was to contribute $ 15,000 while the limited partners were expected to contribute an aggregate sum of $ 1,840,000. The film would be purchased for a price of $ 1,650,000. The memorandum did not contain an appraisal of the film. The Agreement provided that the profits would be distributed among the partners pursuant to a formula which divided 97.5 percent of the profits among the limited partners, according to their respective capital accounts and which allocated the remaining 2.5 percent of the profits to the general partner. Losses were to be allocated on a formula which granted 99 percent of the loss to the limited partners and 1 percent of the loss to the general partner until such time as net profits were earned. The memorandum provided that the general partner would receive a management fee of 12 percent of all income from the film's exploitation. *116 Most of the discussion set forth in the memorandum concerned the tax consequences which would result from the investment in Sci-Fi. It was anticipated that depreciation, which would be computed under the income forecast method, would give rise to estimated total depreciation deductions, if there was no offsetting income, in the amounts of $ 942,000 in the first year, $ 157,000 in the second year, and $ 78,500 for each of the next three years. The balance was to be written off in the sixth and final year. The memorandum stated that the investment tax credit would be available with respect to the film, generating an initial deduction in the amount of $ 165,000 for the first year of distribution. [4] The memorandum added that an interest deduction would be allowable for each limited partner who financed part of his subscription payment with a promissory note. *117 The memorandum indicated that the distribution of a motion picture was a risky endeavor, emphasizing that not only would the commercial success of the film be "highly speculative" but the beneficial tax consequences might be disallowed by respondent. The memorandum stated that if the film were a financial success, additional films would be purchased to shelter the partners' income. Petitioner also received a letter dated July 10, 1975, and addressed to the general partner, in which Sherman H. Saiger (Saiger), the partnership's attorney, provided an in-depth analysis of the tax consequences of an investment in Sci-Fi. The partnership submitted a Certificate of Limited Partnership (the Certificate) to the State of New York on November 21, 1975. The Certificate listed one general partner, Sam Shaw, and 33 limited partners. Petitioner's name was among those listed. The Certificate indicated that the partnership's purpose was exploiting motion pictures. The general partner, Sam Shaw, had considerable experience in various areas concerning advertising campaigns for film distribution endeavors. The memorandum also listed as consultants Israel Katz (Katz), a certified public accountant, *118 Saiger, an attorney specializing in entertainment law, and Milton Perlman (Perlman), a corporate and motion picture consultant. Katz was employed by David Katz & Company, the firm which performed accounting services for the partnership. Perlman had produced a film called "The Goddess" which had been nominated for an Academy Award. Saiger was counsel to the partnership. Sam Shaw was a client of David Katz & Company. On June 20, 1975, Sci-Fi had purchased the rights to the film "Solaris," with respect to distribution in the United States and its territories. The seller was Michel Productions, S.A. (Michel Productions), a Lichtenstein corporation. The stated purchase price was $ 1,650,000 and the purchase agreement indicated that payment in the amount of $ 25,000 was received on the date of sale. There is no other documentary evidence showing that additional payments were ever made. Although the film itself was not introduced into evidence [5] petitioner's brief indicates that "Solaris" was an artistic science fiction film, originally in Russian but subtitled in English. The director, producer and cast were Russian. The film was based on an award winning book. *119 Pursuant to an agreement executed on September 15, 1975, Sci-Fi arranged to have the film distributed by Magna Distributing Corporation (Magna). The distribution agreement provided Magna with exclusive rights to distribute the film in the United States and all its territories and possessions. The distribution agreement did not guarantee a minimum number of play dates. The term of the agreement was 5 years with a provision for renewal for another 5 years. Magna was to retain 40 percent of the gross receipts, defined as receipts net of distribution costs, and to pay the remaining 60 percent to Sci-Fi. [6] Magna agreed to pay a non-returnable advance, in the amount of $ 55,000, against anticipated gross receipts. Sci-Fi entered this figure as a bad debt on its 1976 partnership income tax form, indicating that Magna had failed to pay. The distribution agreement provided that Magna could distribute the film with or without subdistributors. *120 The officers of Magna were Perlman, Saiger and Katz. These same individuals were also listed as the consultants to Sci-Fi. Saiger and Katz performed services for the partnership. Magna initially gave the address of David Katz & Company as it's own mailing address. Magna employed Larry Shaw who is Sam Shaw's son. Subsequent to distributing "Solaris" Magna ceased operations as a film distribution company and was defunct at the time of trial. On October 17, 1975, petitioner made a subscription payment in the amount of $ 28,750. In exchange, petitioner received a 1.56 percent interest in Sci-Fi. [7] Petitioner financed 75 percent of his capital contribution, and made a cash payment for the remaining 25 percent in the amount of $ 6,250. Following the directions of Sam Shaw, Sci-Fi's general partner, petitioner executed a promissory note (the note) payable to Manchester Establishment in the amount of $ 22,500. Petitioner indicated to Manchester Establishment that his net worth exceeded $ 100,000. The note bore an interest rate of the greater of 8 percent or 2 points over prime. Principal was due in 4 installments. [8] In a Pledge Agreement, dated August 25, 1975, petitioner agreed *121 to pay interest and principal due on the note from distribution proceeds only, pursuant to a formula which required petitioner to pay 60 percent of all distribution proceeds received until such time as he had paid $ 15,000. At that time, petitioner was to pay 50 percent of all distribution proceeds received until the entire obligation had been satisfied. The Pledge Agreement provided that the note was secured by a pledge of petitioner's partnership interest in Sci-Fi. The note contained an option to convert the liability to full personal liability, exercisable by December 31, 1975. Petitioner declined to exercise the option. In exchange for the note, Manchester Establishment gave petitioner an unsigned, undated check in the amount of $ 22,500. *122 Sci-Fi claimed deductions and an investment tax credit for the years at issue. Using a depreciable basis of $ 1,570,000 Sci-Fi computed depreciation using the income forecast method. Sci-Fi's books reflect the following: Taxable
Total Net
Year
Gross Receipts
Depreciation
[9] Expenses [10] Loss 1975
$ 55,000.00
$ 863,500.00
$ 177,483.53
$ 985,983.53
1976
18,591.48
262,676.70
30,699.54
274,784.76
1977
6,299.00
62,135.00
1,942.00
57,778.00
1978
14,473.00
142,733.00
2,850.00
131,110.00
On his Federal income tax returns petitioner took losses with respect to his interest in Sci-Fi in the following amounts: $ 15,283 in 1975, $ 5,926 in 1976, $ 895 in 1977 and $ 2,025 in 1978. Petitioner *123 also claimed an investment tax credit in the amount of $ 2,558 in 1975. OPINION The first issue for our decision is whether respondent properly disallowed petitioner's deductions of his distributive share of the partnership losses. These losses were comprised of the investment tax credit and deductions for depreciation and miscellaneous business expenses. Resolution of this issue depends on whether petitioner entered into the activity with the actual and honest objective of making a profit. In order to take deductions for depreciation and business expenses, with respect to an asset, the asset must be used in the trade or business or held for the production of income within the meaning of section 167(a). Similarly, the investment tax credit may be taken only with respect to depreciable property. Because there was no evidence to suggest that the partners' activity with respect to the film constituted a trade or business, the inquiry is whether the partners' activity with respect to the film was investment activity. Higgins v. Commissioner,312 U.S. 212 (1941). In *124 order to establish investment activity, petitioner must prove that the film was held for the production of income. Beck v. Commissioner,85 T.C. 557 (1985). Whether Sci-Fi engaged in its activities for profit depends on whether the activity was undertaken with an "actual and honest objective" of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one but the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Golanty v. Commissioner,72 T.C. 411 (1979) affd. without opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Transactions which serve no "purpose, substance or utility apart from their anticipated tax consequences" are disregarded for tax purposes. Knetsch v. United States,364 U.S. 361 (1960); *125 Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). When petitioner is a limited partner, as he is in this case, the primary focus is on the actions of the general partner. Finoli v. Commissioner,86 T.C. 697 (1986). The determination of whether a profit motive exists is to be resolved on the basis of all the attenuating facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. Although section 183 is actually an allowance provision, not a disallowance provision, respondent's regulations promulgated under that section have historically been employed to facilitate the determination of the existence of a profit motive. Respondent's regulations *126 set forth 9 relevant factors. Sec. 1.183-2(b), Income Tax Regs.[11] No single factor is controlling. Golanty v. Commissioner, supra at 425-426. In this analysis greater weight is accorded to proven objective facts that to mere statements of intent. Beck v. Commissioner, supra at 570; Siegel v. Commissioner,788 T.C. 659, 699 (1982). Respondent disallowed these losses on the grounds that the partnership was neither organized nor operated with the intention of making a profit. Respondent contends *127 that the entire transaction constituted an "abusive tax shelter." Petitioner maintains that the primary goal of the partnership was to produce income from the commercial exploitation of the film and, therefore, that all deductions and credits were properly taken. Petitioner bears the burden of proving that the partnership had a profit motive. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). For the reasons discussed below and based on our consideration of all the facts and circumstances, we conclude that the activity of the partnership, Sci-Fi, was not engaged in with the intent to make a profit. Therefore, the partnership is not entitled to an investment tax credit with respect to the film activity. Furthermore, deductions for depreciation and miscellaneous business expenses attributable to such activity are allowable only to the extent permitted in section 183(b). [12]
*128 Petitioner presented little testimonial evidence and we are compelled to draw our information almost exclusively from the exhibits introduced into evidence at the trial. [13] The exhibits tell the now familiar story of an investment activity which was organized and operated for the production of tax losses to shelter the partners' other income. The memorandum, designed to inform prospective investors of the nature of the investment, focused predominantly on the tax benefits available. The memorandum discussed depreciation and investment tax credits in detail, even offering sample figures to demonstrate the effect of an investor's unrelated income. In sharp contrast, the memorandum hardly touched on economic success. The memorandum mentioned that the investment was highly speculative *129 but did not include any income and cost projections to supplement the warning. The memorandum did not include an appraisal of the film's fair market value. There was only minimal discussion of the nature and quality of the film itself, accompanied by a very brief statement describing the distribution goals. The memorandum stated that in the event of economic success additional films would be purchased to offset the resulting income. In short, the memorandum leads to the unavoidable conclusion that the purpose of the Sci-Fi endeavor was the development and distribution of tax losses. Most of the individuals who organized the partnership were inexperienced in the film industry. Sam Shaw, the general partner, has an extensive record in film commercialization but the other promoters do not share such credentials. Although Perlman had experience producing films, there was no indication in the record that he was active in the partnership or that he had any experience with the commercial exploitation of films. The promotional materials were prepared and circulated by Katz and Saiger. Neither Katz nor Saiger had any experience or knowledge with respect to the commercial exploitation *130 of films. These promoters were more knowledgeable and skilled about financial affairs than about film distribution. The fact that the same individuals who designed and promoted the deal also played every other major role suggests the partnership affairs were not conducted in a businesslike fashion. Katz, Saiger and Perlman were the consultants to the partnership, performed services for the partnership and were the officers of Magna, the distribution company. Sam Shaw's son was employed by Magna. Petitioner failed to present a plausible explanation for the fact that the entities involved were all controlled by the same people. The natural conclusion is that the entities participating in the transaction were not independent but were designed to create the appearance of professionalism and businesslike activity. The record failed to show that Magna was an established company of good reputation. There was no evidence that Magna had ever engaged in any distributional activity prior to the arrangement with Sci-Fi. Magna has not conducted any subsequent business. There was no evidence that Magna had a distribution plan. The fact that Magna was controlled by the same individuals *131 who organized and promoted Sci-Fi suggests that Magna was merely a shell corporation. The circumstances surrounding the signing of the promissory note cast a suspicious light on the Sci-Fi investment. The memorandum discusses the additional tax benefits that would accrue if the partner were to finance his subscription payment. Sam Shaw suggested Manchester Establishment as the lender. Thus, the arrangement with Manchester Establishment was integral to the original plan. There was no evidence that Manchester Establishment was a legitimate independent entity. The check that petitioner received as the proceeds for the purported loan was unsigned and undated, and presumably non-negotiable. This fact undermines petitioner's contention that the debt was bona fide. There was no evidence that petitioner was subjected to a credit check prior to signing the note. Although petitioner indicated on the face of the note that his net worth equalled $ 100,000, there was no evidence that he would have been denied the loan if his net worth was not what he purported it to be. Finally, the note was nonrecourse on its face, although the note contained an option for conversion to full recourse *132 which petitioner never executed. Although, in form, the note purported to require repayment in 4 installments, in substance, repayment was limited to the distribution proceeds from the film. If the film was not successful, the creditor would be restricted to the value of petitioner's partnership interest for a source of repayment. There is nothing about this note to indicate that either the maker or the holder ever entertained the notion that the note would be repaid. Both petitioner and respondent introduced into evidence the testimony of expert witnesses who testified about the fair market value of the film. Opinion testimony of an expert is admissible if, and because, it will assist the trier of fact to understand evidence that will determine a fact in issue. See rule 702, Federal Rules of Evidence. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other relevant evidence in value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), *133 affg. A Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. Petitioner called Sol Horowitz (Horowitz) to testify to the value of "Solaris." At trial, Horowitz was not qualified to testify about the film's fair market value because such testimony was not within his area of expertise. Horowitz worked for Walter Reade Company (Walter Reade), a company which operated a chain of theatres across the United States. Horowitz, who specialized in art films, was employed to book the films which would play in the Walter Reade theatres. In his professional capacity, Horowitz viewed "Solaris" which he booked to play in some of the Walter Reade theatres. [14] Before working for Walter Reade, Horowitz had worked in essentially the same capacity for several major theatre chains including Loew's, Allied and Barman & Katz, the predecessor of Cineplex. Horowitz' employment requires *134 him to accurately judge and predict the future popularity of each art film which he views. Horowitz described "Solaris" as one of the best films he had ever seen. He described it as "metaphysical" and "poetic," comparing "Solaris" favorably with Stanley Kubrik's "2001 Space Odyssey." Horowitz believed that the film's artistic value was due in part to the excellent reputation of the author of the book upon which the screenplay was based. [15] Horowitz stated that the director of "Solaris" was not well known in 1975, although the author of book was popular. Noting that foreign art films, in general, are less commercially successful than popular American-made films, Horowitz estimated that "Solaris" would generate gross income in the amount ranging between $ 3.5 million and $ 5 million dollars. *135 Respondent's expert witness was Woodrow Sherrill (Sherrill) who testified about the fair market value of "Solaris." Sherrill worked in budget preparation as a regional manager for Metro-Goldwyn-Mayer, a job which required him to evaluate the commercial viability of films. Sherrill had no special expertise in foreign-made art films. Sherrill has testified before us for respondent on several other occasions. In evaluating a film, Sherrill considers the story, the cast and the market. Disagreeing with Horowitz, Sherrill would not consider the book on which the film was based to be a major contributing factor to the ultimate success of the film, noting that good books do not always produce good films. Furthermore, Sherrill noted, art films such as "Solaris" pose additional difficulties because the general public is not receptive and particular markets must be sought. According to Sherrill, the reviews of film critics are crucial to the success of an art film. Thus, the distribution scheme for an art film would require special up-front screening to allow the critics an opportunity to review the film. These costs, which Sherrill described as "start up" costs would be required at each *136 location in which the film was distributed. The additional start up costs would increase the net distribution expenses. If Magna distributed "Solaris" through a subdistributor, as was customary, the total expenses including the subdistributor's fee, the advertising costs and the storage and shipping expenses would consume approximately 49 percent of the gross box office receipts. Sherrill noted that the commercial success of the film was further hampered by the fact that the cast were all unknown in the United States and that the film had been subtitled into English. Sherrill stated that the art film market is comparatively small with approximately 30 theatres in the United States. With only 30 theatres, the art film market rarely produces revenue in the amounts generated in the larger popular film market. In conclusion, Sherrill determined that the film had a fair market value of zero at the time of its purchase by Sci-Fi because the costs of distribution would exceed gross receipts. In weighing the testimony of these two experts, we find them both credible in their respective areas of expertise. Horowitz' area of expertise is the artistic value of the film. He stated "Solaris" *137 was well crafted and that the story was provocative and entertaining. Much of petitioner's argument on brief concerns the artistic merit of the film. We conclude that "Solaris" is a fine example of its genre and deserves critical acclaim. That conclusion, however, only begins to address the issue before us which concerns the film's commercial value. Whether the film is intellectually and esthetically appealing is not the same as whether it will be commercially successful. Sherrill's area of expertise lies in estimating the commercial viability of all types of films. Horowitz does not specialize in the financial aspects of the industry but Sherrill does. Thus, we take from each expert the testimony which is derived from his area of greatest expertise, and conclude that the film was an excellent film judged on its own artistic merits, but that it had little chance of commercial success at the time it was purchased. Petitioner urges us to consider the film's distribution history, and indicates that the film has been distributed in art theatres around the country. Much of the information which petitioner requests us to consider was never admitted into evidence, despite respondent's *138 willingness, and cannot be taken into account. In any case, the inquiry which we conduct here focuses on the circumstances surrounding the investment at the time of purchase. We look for evidence of the partners' intent to generate profit from the commercial exploitation of the film. We do not find sufficient evidence that petitioner's investment in Sci-Fi was prompted by a profit motive. Rather we find that, at the time of Sci-Fi's purchase, the production of profit from this film was extremely improbable. Using Horowitz' rosiest prediction, that total receipts could equal $ 5,000,000, the film would lose money. Because distribution costs alone would subtract 49 percent and Magna's fee of 40 percent and Shaw's management fee of 12 percent would be subsequently subtracted, revenue in the amount of $ 5,000,000 would produce income to Sci-Fi in the amount of $ 1,452,400, less than the total cost of the film. In the absence of evidence to the contrary, we find that Sherrill's estimate of the fair market value of "Solaris" is more reasonable and believable than the estimate supplied by Horowitz. In conclusion, we find that the partnership, Sci-Fi, was created and operated to produce *139 tax benefits which did not reflect underlying economic realities. The promotional materials stress tax benefits to the exclusion of economic reward and manifest that the investment in Sci-Fi was intended to generate favorable tax results and not economic profit. The substantial overlap in personnel indicates that the various entities which purported to arrange the transaction between them were really paper shells creating the illusion of business activity. The note with which petitioner financed his investment in Sci-Fi was nonrecourse and unlikely to be repaid. If the partnership was unlikely to receive full payment it would, in turn, probably not pay the full stated purchase price of the film. The film's actual value was far lower than it's purported purchase price. Despite it's critical acclaim, "Solaris" had little or no chance of commercial success and the investors should have known this. Although the record in this case is scant and we are forced to rely heavily on the documentary evidence, the record, taken as a whole, shows a total absence of profit motive. Thus, Sci-Fi's activity with respect to "Solaris" was neither a trade or business nor was it conducted for the production *140 of income. [16]
The final issue for our consideration is whether petitioner is liable for the additional interest on substantial underpayments of tax attributable to tax motivated transactions pursuant to section 6621(c) in the taxable years 1975 and 1976. Respondent requested the addition to tax by amendment to answer and thus has the burden of proof. Zirker v. Commissioner,87 T.C. 970 (1986); Parker v. Commissioner,86 T.C. 547 (1986); Rule 142(a). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). *141 Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a substantial underpayment attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Section 6621(c)(3)(A) enumerates the types of transactions which are to be considered tax motivated transactions. These include "(i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified by regulations prescribed by the Secretary as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). Under regulations issued by respondent pursuant to the express authority of section 6621(c)(3)(B), the definition of tax motivated transaction also includes any deductions disallowed for any period under section 183. Sec. 301.6621-2T, Q and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). We held above that Sci-Fi's activity with respect *142 to the film "Solaris" was arranged to generate tax benefits and was not entered into for profit. Section 6621(c) also applies to underpayments attributable to the investment tax credit resulting from petitioner's claim of basis in excess of fair market value, which is a valuation overstatement within the meaning of section 6659(c) and therefore a tax motivated transaction under section 6621(c). Therefore all the deductions and credits claimed by petitioner with respect to the partnership's activity were attributable to a tax motivated transaction. See Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). In sum, after considering all the evidence presented in this case we conclude that petitioner has failed to meet the burden of proving that the investment in Sci-Fi was entered into for profit. We hold that petitioner's deductions for depreciation and business expenses and petitioner's investment tax credit taken with respect to the interest in Sci-Fi were improperly taken. Furthermore, we have determined that any substantial underpayments in tax which result from this *143 disallowance were attributable to a tax motivated transaction and are thus properly subject to the additional interest under section 6621(c). Decisions will be entered for the respondent.
Footnotes
1. Docket No. 39343-84 was originally designated a small tax case pursuant to the provisions of section 7463 of the Internal Revenue Code of 1954. Respondent's motion to remove the case from the small tax case docket and to consolidate it for trial with petitioners' regular case, docket No. 6167-84, was granted by this Court on October 21, 1985. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Former subsection (d) of section 6621↩ was redesignated as subsection (c) and amended by section 1511(c)(1)(A)-(C), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. 3. The memorandum gave the following break down of capital contribution proceeds: ↩
Acquisition of Film
$ 1,650,000
Advertising
100,000
Management
20,000
Commissions
40,000
Legal Fees
15,000
Accounting Fees
10,000
Formation/Miscellaneous
5,000
TOTAL        $ 1,840,000
4. The memorandum summarized the tax benefits as follows: 1975
1976
1977
thereafter
Depreciation
$ 785,000
$ 314,000
$ 78,500
$ 392,500
Operation
160,000   * * *
Interest
60,000    * * *
Investment Tax Credit
330,000   * * *
Per Unit   41,720   J9,710 2,230   12,140   * Interest and operations will be deducted to the extent that income is generated. ↩
5. Petitioner had sent the film to respondent's facility in Atlanta, Georgia, where it was apparently misplaced. Petitioner did produce a copy of the book on which the film was based but petitioner failed to enter the book as evidence. ↩
6. If Magna distributed the film to television networks or through television syndication, Magna was entitled to retain 15 percent of the gross receipts derived from television networks sales and 35 percent of the gross receipts derived from syndication sales as a distribution fee. ↩
7. According to the memorandum, the partnership interests costs $ 58,700 apiece. Therefore, $ 28,750 would purchase a .56 percent interest rather than a 1.56 percent interest. Neither party explained this discrepancy. ↩
8. The Manchester note provided that no less than 25 percent of total principal was to be paid in installments dated August 25, 1988, August 25, 1989, August 25, 1999 and August 25, 1991. There is no reason to believe that the third date, August 25, 1999, is anything other than a typographical error, and was intended to read August 25, 1990. ↩
9. Expenses included management and professional fees, publicity and advertising, office and clerical costs, travel and entertainment expenses, organization expenses and screening and shipping costs. ↩
10. In the stipulated chart which the parties submitted, some of the figures representing the totals were incorrect. We presume this arises from mathematical mistakes. Based on this premise, we have recalculated the figures and correct amounts. ↩
11. These factors are (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. ↩
12. Section 183(b) provides in pertinent part: In the case of an activity not engaged in for profit * * * there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). ↩
13. Petitioner submitted numerous documents directly to the Court which had not been admitted into evidence, by the conclusion of the trial. Although respondent was willing to stipulate to the admissibility of those documents in a Supplemental Stipulation of Facts petitioner declined to sign the Supplemental Stipulation. The documents were never admitted into evidence and were not considered. ↩
14. Horowitz stated that the film was shown in Boston, Chicago, New York, San Francisco, Philadelphia, Austin and Princeton. ↩
15. In response to petitioner's hypothetical question Horowitz indicated that he would be favorably impressed by a film which had won an award at the international film festival in Cannes, France. However, whether or not "Solaris" ever did receive such an award was not a fact which was introduced into evidence. ↩
16. This case was tried and briefed by the parties in terms of a profit objective under section 183. Accordingly, our analysis is based upon that approach. But see Rose v. Commissioner,88 T.C. 386↩ (1987), which adopts a test of economic substance as to "generic" tax shelters.